Submitted on briefs April 17, affirmed May 1, rehearing denied May 29, 1923.

# WILSON v. CITY OF MEDFORD ET AL.

(215 Pac. 184.)

**Municipal Corporations—Charter Provision for Consolidated Lien Docket and Consolidated Improvement Fund Held not Invalid as Conflicting With State Law as to Redemption of Bonds Issued Thereunder.**

1. City Charter of Medford, Chapter 14, Section 143, of which provides for a consolidated lien docket, in which all lots charged with unpaid improvement assessments are entered, and Sections 144, 151, 153, for a consolidated improvement fund, the proceeds of which were used, as authorized by Section 146, to retire "improvement bonds" issued under the Bancroft Bonding Act (Section 3791, Or. L.), *held* not invalid as conflicting with Section 3793, Or. L., providing for improvement bond sinking and interest funds for the redemption of such bonds; that purpose having been accomplished.

**Municipal Corporations—Charter Provision for Entry of Delinquent Assessments on Consolidated Lien Docket Held not Invalid.**

2. City Charter of Medford, Chapter 14, Section 143, of which provides for a consolidated lien docket, on which are entered all lots charged with unpaid improvement assessments, provision for the collection of which by selling the property is made by Section 147, as authorized by Section 3792, Or. L., *held* not invalid as dispensing with the bond lien docket required by the Bancroft Bonding Act; lots governed thereby still appearing on such docket and every nondelinquent installment being paid thereon.

Statutes—Validity of Charter Provisions as to Sale of Land for
    Delinquent Assessments Held not Affected by Invalidity of
    Other Sections.

3.    City Charter of Medford, Chapter 14, authorizing the city to
sell land for delinquent assessments, *held* not invalid because of
Section 159, authorizing the city to protect the liens of assess-
ments on land offered for sale for general taxes by purchase or
otherwise, or Section 150, postponing the lien acquired under Section
148 by a purchaser of land sold for delinquent assessments to claims
of subsequent purchasers and encumbrancers, unless the certificate
of sale be recorded in the county recorder's office within thirty days;
the invalidity of such sections, if assumed, not affecting the valid-
ity of the rest of the chapter.

Municipal Corporations—Charter Provision Authorizing City to Pro-
    tect Liens of Assessments on Land Offered for Sale for General
    Taxes, by Purchase or Otherwise, Held not Invalid.

4.    In view of Laws of 1919, Chapter 239, Section 2 (Section
4344, Or. L.), authorizing cities having liens on real property in-
cluded in certificates of tax delinquency to use their funds for the
redemption thereof and to purchase such property under foreclosure
of such certificates, City Charter of Medford, Chapter 14, is not
invalid because of Section 159, authorizing the city to protect, by
purchase or otherwise, the liens of assessment against property
offered for sale for general taxes.

Municipal Corporations—City cannot Expand Duties of State or
    County Officers Beyond Limits Fixed by State Laws.

5.    A city may require the recording in the county recorder's
office of any paper which it would be his duty to record under
state law if presented by any individual, but cannot, under the
guise of municipal legislation, expand the duties of state or county
officers beyond the limits fixed by state laws.

Municipal Corporations—Title of Purchaser of Lots Subsequently
    Sold to City for Delinquent Assessments Against Grantor Held
    Subject to City's Lien, Notwithstanding Invalidity of Charter
    Provision as to Recordation of Certificate of Sale.

6.    One purchasing lots afterward sold to the City of Medford
for delinquent assessment installments accruing during her immedi-
ate grantor's ownership takes subject to the city's rights under its
assessment liens, even if City Charter of Medford, Chapter 14, Sec-
tion 150, postponing the lien of the purchaser at the assessment
sale to claims of subsequent purchasers, unless the certificate of
sale is "recorded in the county recorder's office" within thirty days,
be invalid as expanding the duties of such officer beyond the limits
fixed by state law; the purpose of such section being to fix the
rights between the holder of a certificate of sale and subsequent
purchasers.

Municipal Corporations—Repeal of Charter Provisions as to Re-
    demption and Conveyance of Property Sold for Delinquent
    Assessments and Substitution of New Provisions Covering Sub-
    ject Matter Held Within City's Power.

7.    City Charter of Medford, Chapter 14, repealing and embracing
in Section 150 the subject matter of Special Laws of 1905, page 1010,
    107 Or.—40

Section 87, reserving to the owner of land sold for delinquent assessments the right to redeem in the manner and with the penalties provided for redemption from tax sale, and authorizing the owner of the certificate of sale, after two years from the sale, to apply to the recorder and receive a deed, which becomes absolute a year later, *held* within the city's power.

**Municipal Corporations—Certificate of Sale of Land for Delinquent Assessment Need not be Acknowledged or Recorded as Between Owner and City.**

8. As between the owner of lots sold for delinquent improvement assessments and the city, the rights of the holder of the certificate of sale would not be affected by failure to record it, nor would the city's rights be lessened if the certificate, though recorded, were void because not acknowledged.

**Municipal Corporations—Property Subject to Delinquent Assessment may be Struck Off to City if No One Bids Enough to Pay Assessment.**

9. Property subject to delinquent improvement assessments may be struck off to the city as authorized by City Charter of Medford, Chapter 14, where no one bids enough to pay the assessment, as against the objection that it results in taking property from the tax-roll to the injury of the taxpayers.

**Municipal Corporations—Voters, by Amending Charter or Enacting New One, may Take All or Part of Intramural Power Set at Large by State Constitution.**

10. The legal voters of a city, by amending their charter or enacting a new one, may take all or part of the whole sum of intramural power, which is set at large by Constitution, Article IV, Section 1a, and Article XI, Section 2.

**Municipal Corporations—Whether Powers Granted by Home Rule Charter are Within Scope of Municipal Authority Depends on Whether Voters had Constitutional Right to Grant Them.**

11. In determining whether the powers granted by a charter amendment, adopted by the legal voters of a city, are within the scope of municipal authority, the question is not whether the language of the charter is broad enough to include the power claimed, as in the case of a charter granted by the legislature, but whether the voters had the right under the Constitution to do what they attempted to do.

**Municipal Corporations—Power to Assess Cost of Improvements Against Adjacent Property Includes Power to Employ Necessary Procedure.**

12. The powers to pave streets, lay sewers, and assess the cost against adjacent property, are essentially and distinctly intramural and municipal and include the power to employ such modes of procedure as are appropriate and necessary for effectively exercising them.

Municipal Corporations—Power to Levy Special Assessment is Attribute of Sovereignty.

13.  The power to levy a special assessment, though it is different from a pure tax, is a branch of the power to tax, and hence an attribute of sovereignty.

Municipal Corporations—Power to Sell Land for Delinquent Assessment Proper Remedy for Enforcement of Power to Tax.

14.  The power to sell land for a delinquent assessment against it is a mere incident to, and a proper and necessary remedy for enforcement of, the power to tax.

Municipal Corporations—Lien of Assessment may be Enforced by Foreclosure Suit or Sale of Land and Execution of Deed.

15.  The lien of an assessment may be enforced by an ordinary suit in equity for foreclosure, or by selling the land and executing a deed, as authorized by City Charter of Medford, Chapter 14, Sections 147, 148; any procedure which does not impose new duties on state courts or direct and control state instrumentalities, and will adequately furnish due process of law being sufficient.

Municipal Corporations—City cannot Regulate Procedure in Circuit Court for Foreclosure of Assessment Lien.

16.  A city can avail itself of state processes and instrumentalities, but cannot regulate the procedure in a suit to foreclose an assessment lien, nor direct the course to be followed by a state instrumentality such as the Circuit Court.

Action—Decision of Merely Incidental Questions Concerning Provisions of City Charter Postponed Until Case is Presented Requiring Determination.

17.  Where a city charter amendment is held valid and constitutional in all essential and material features, decision of questions which may arise out of merely incidental and subordinate provisions must be postponed until a case is presented requiring a decision.

Municipal Corporations — Medford Charter, Authorizing Sale of Property for Delinquent Assessments and Execution of Deed to Purchaser After Time for Redemption, Held Valid.

18.  City Charter of Medford, Chapter 14, authorizing the sale of property to satisfy delinquent improvement assessments (Section 147), giving the purchaser a lien (Section 148), and providing for the issuance of a deed to him (Section 150), on presentation of the certificate of sale, after giving the notice prescribed by Section 154 if not redeemed within three years, *held* valid and constitutional as within the scope of municipal authority in all essential and material features.

From Jackson: F. M. CALKINS, Judge.

In Banc.

This is a suit brought by Grace M. Wilson against the City of Medford and its officers to quiet

the title to three lots in Medford. The plaintiff alleged that she owned the lots, and she called upon the city to assert any right, title or interest it claimed to have in the property. The city answered by asserting that the three lots had been sold to the city for delinquent installments due on an assessment levied against the lots for paving an adjacent street.

The Circuit Court decreed that the plaintiff is the owner of the property subject to the rights of the city under its assessment liens against the lots

"and its sale of said property for the delinquent installments of said assessments, which rights are subject to redemption by plaintiff at any time after the sale up to the time of the issuance by the city of deeds of said property upon the payment of the amounts of said delinquent assessments, interest, penalties and costs together with taxes, other installments of assessments and other charges paid by the purchaser at or since said sale with like interest thereon."

The plaintiff appealed.

AFFIRMED. REHEARING DENIED.

For appellant there was a brief over the name of *Mr. V. A. C. Ahlf.*

For respondents there was a brief over the name of *Mr. Fred W. Mears.*

HARRIS, J.—Strangers to the present litigation may better understand the questions herein involved by reading the opinions rendered in *Colby* v. *City of Medford,* 85 Or. 485 (167 Pac. 487), and in *Fehl* v. *City of Medford, ante,* p. 478 (215 Pac. 180); and any person can more thoroughly understand the questions which must be decided if we first relate the facts which make up the story of this lawsuit. No evi-

dence was introduced, but by agreement of the parties the case was submitted to the court upon the pleadings supplemented by two stipulated facts.  In 1910 and 1911 the city paved South Grape Street and assessed the cost of the improvement to the three lots, involved here, and to the other adjacent property.  An assessment of $295 was levied against each of the three lots as its share of the cost of the pavement, and that amount was entered upon the lien docket, "and thereafter said City of Medford duly caused notice of said assessments to be published as required by the charter of said city"; and "thereupon within ten (10) days thereafter" Owen D. Nagle, who was then the owner of the lots and is the immediate grantor of the plaintiff, made application under the Bancroft Bonding Act for the right to pay the assessment as to each of the three lots in ten annual installments as permitted by that act.  Nagle paid the first three annual installments, together with interest, "the last payment being on August 21, 1913"; but no other payment has been made since that date.

On April 3, 1918, the legal voters of Medford in the exercise of the initiative amended the city charter. The amendment is designated as Chapter 14 and is so referred to in *Fehl* v. *Medford, supra.* In the instant case the amendment is sometimes styled the "Medford Extended Payment Plan." In *Colby* v. *City of Medford,* 85 Or. 485 (167 Pac. 487), a charter amendment, which had been adopted on January 9, 1917, and was known as the Hanson Plan, was reviewed and held to be unconstitutional, principally upon the ground that it attempted by compulsion to bring under its operation all unpaid assessments, whether due or not due, including those governed by the Bancroft Bonding Act as well as assessments

governed by a charter provision modeled after the Bancroft Bonding Act. After the decision was rendered in *Colby* v. *Medford,* another proposed amendment was prepared and submitted to the voters and by them adopted on April 3, 1918; and it is this amendment which is involved in the present suit.

Chapter 14, the amendment now in force, was framed in the light of the opinion rendered in *Colby* v. *Medford,* and with the purpose of eliminating the objectionable features which affected the original Hanson Plan. Chapter 14 is appropriately called the "Medford Extended Payment Plan"; for it was designed to relieve the pressure of municipal indebtedness by extending the time for paying sewer, paving and water-main assessments. Any owner, whose property had been charged with a paving, sewer, or water-main assessment, could under Chapter 14 at any time within 30 days prior to July 1, 1918, make application to bring his property under the operation of that chapter. It made no difference whether the assessed property had or had not been brought under the Bancroft Bonding Act; nor did it make any difference whether any installment of an assessment, charged against property brought under the Bancroft Bonding Act, had become delinquent. The property owner who had brought his property under the control of the Bancroft Bonding Act was granted the right under Chapter 14 to withdraw his property from the embrace of that act and bring it under the operation of the charter amendment, but he was not compelled to do so. If he applied for permission to pay an assessment under Chapter 14 the unpaid balance of the assessment, including matured installments, if any, was taken as an integral and divided into twenty parts. The period of thirteen years was

fixed as the time within which to pay the unpaid balance of the assessment. Interest only was required to be paid during the first three years, but every six months thereafter one installment with interest is made due and payable.

Chapter 14 provides for a consolidated lien docket. The city recorder was required to enter in that docket every lot charged with an unpaid assessment; and by the terms of Section 143 of Chapter 14,

"such docket shall stand thereafter as a consolidated lien docket, as for taxes assessed and levied in favor of the city and the amounts of the unpaid assessments, including interest therein docketed, shall be paid and the liens thereof enforced as in this act provided and shall be and remain a lien on each lot or parcel of land, or other property, respectively, in favor of the city and such liens shall continue to have the same priority over all other liens and encumbrances whatsoever as prescribed by state law and the city charter when such respective liens attached.''

The Bancroft Bonding Act provides for a bond lien docket; and so all lots previously brought within that act had already been entered in that bond lien docket, and presumably all other lots burdened with assessments but not brought within the Bancroft Bonding Act were nevertheless listed in some sort of a lien docket provided for by the city charter. When the time expired for making application to pay under Chapter 14, the recorder was required to ascertain the lots which had been brought under the Bancroft Bonding Act and for which applications had not been made to pay under Chapter 14. If any installment of an assessment still protected by the Bancroft Bonding Act was delinquent and another installment was not yet due the recorder was obliged

"to correct such assessments upon the consolidated lien docket so that there shall appear thereon only

such delinquent installments and delinquent interest and to retransfer to the appropriate bond lien docket the installments of such assessments not due, with interest at the rate chargeable to such assessments''; and if thereafter any installment so retransferred to the appropriate bond lien docket becomes delinquent, then "the amount of any such installment or installments, with interest so becoming delinquent, shall thereupon be entered by the city recorder upon the consolidated lien docket"; but "as to assessments already bonded and concerning which no application shall be filed" for the privilege of paying under Chapter 14, the installment not yet matured "shall, prior to delinquency thereof, be payable upon the bond lien docket upon which the same was originally entered and in accordance with the application filed to pay such assessments in installments; but delinquent installments of such assessments whether such delinquency occurred prior to or after the expiration of such thirty (30) day period, shall appear upon the consolidated lien docket and be collected and the liens thereof enforced as in this act provided.''

We may summarize the acts required to be done by the recorder thus: He transferred to the consolidated lien docket all unpaid assessments. At the expiration of the time for filing applications to pay under Chapter 14, the recorder examined the consolidated lien docket and ascertained what lots had been brought under the Bancroft Bonding Act. Lots which had been brought under the Bancroft Bonding Act were divided into two classes: (1) Lots brought under Chapter 14 by the application of the owner to withdraw his property from the operation of the Bancroft Bonding Act and to pay the unpaid balance in thirteen years; and (2) lots not so brought under Chapter 14. The first class of lots was left by the recorder on the consolidated lien docket, for the unpaid balances due on the assessments against those

lots were payable, when due, on that docket. The second class of lots was in turn divided into three classes: (a) those upon which no installment was delinquent; and (b) those upon which all installments were delinquent; and (c) those upon which one or more installments were delinquent and one or more installments had not yet matured. Lots falling in class (a) were retransferred to the appropriate bond lien docket, for until delinquent all those installments were governed by the Bancroft Bonding Act. Lots falling in class (b) remained on the consolidated lien docket because all the installments charged against that class of lots were collectible on the consolidated lien docket. Lots in class (c) were as to the delinquent installments left on the consolidated lien docket, for those delinquencies were made collectible in the mode prescribed by Chapter 14; but as to installments not yet due a retransfer was made to the appropriate bond lien docket, because until delinquent those installments were governed by the Bancroft Bonding Act. If, however, any installment so retransferred to the "appropriate bond lien docket" subsequently became delinquent, such delinquent installment was again retransferred to the consolidated lien docket, for such delinquent installment was and is collectible under Chapter 14 and in the mode prescribed by that chapter. The Bancroft Bonding Act does not attempt to provide for the method of collecting delinquent installments, but whenever an installment becomes delinquent the restraining hand of the Bancroft Bonding Act is withdrawn and the city is left free to employ its own lawful processes to enforce the collection of the delinquent installment; for by the express terms of Section 3792, Or. L.—

"should such owner or owners neglect or refuse to pay the sum or sums aforesaid as the same shall become due and payable for a period of twenty days, then the same shall be collected in the same manner and with the same penalties as delinquent street or sewer assessments are collected in such city."

As we pointed out in *Colby* v. *City of Medford,* 85 Or. 485, 526 (167 Pac. 487, 500), "the Bancroft Bonding Act is framed upon the theory that the improvement, the apportionment and levy of assessments, and the collection of delinquencies are all governed and controlled by the city charter."

When the time for filing applications to pay under the provisions of Chapter 14 had expired, the recorder examined the consolidated lien docket and ascertained that the owner of the three lots in controversy had brought his property under the protection of the Bancroft Bonding Act, that he had not filed an application to pay the unpaid balance under the "Medford Extended Payment Plan," but that he had elected to permit his property to remain under the Bancroft Bonding Act, that the owner had paid the first three annual installments, but that the fourth, fifth, sixth, seventh and eighth installments had become delinquent; and so the recorder "corrected" the consolidated lien docket by leaving the delinquent installments on that docket and by retransferring to the "appropriate bond lien docket" the installments which had not yet matured. The city then proceeded to collect the delinquent installments in the manner prescribed by Chapter 14, and this was in compliance with Section 3792, Or. L.; for Chapter 14 prescribed the procedure for enforcing the payment of such delinquencies.

The recorder, pursuant to Section 147 of Chapter 14, issued his warrant to the city treasurer command-

ing the treasurer to sell all property "so delinquent
for the amount of such delinquency, with penalties,
interest and costs as in this act provided." The
treasurer gave "notice of sale by publication." The
notice contained a list of all property upon which
assessments were delinquent together with the
amount of the assessments, interest, penalties and
costs, to date of sale, together with the names of the
owners of such property, as the same appeared upon
the consolidated lien docket, and specified the time
and place of sale and that the property would be
sold to satisfy the assessment, interest, penalties and
costs due upon them. The sales were public.

It is provided in Section 147 of Chapter 14 that
interest payments and installments of assessments
under the provisions of Chapter 14 and

"installments of assessments heretofore bonded
under the Bancroft Act or the city charter which shall
become due and payable after the expiration of the
thirty (30) day period * * and which shall remain
unpaid at the expiration of the time fixed for such
respective payments shall thereupon become delin-
quent, and shall bear a penalty of five (5) per centum
upon the amount of such delinquency, in addition to
the bond rate of interest upon the principal sum so
delinquent. For such purpose, if any interest pay-
ment during the first three years as herein provided,
shall become delinquent, it shall be subject to such
penalty and interest upon the sum so delinquent. In-
terest and penalty shall be included in and shall be a
part of the assessment lien."

No person bid "sufficient to pay the delinquent and
unpaid" installments due on the three lots; and so on
January 21, 1919, the treasurer struck "the same
off to the city for the whole amount which he is
required to collect by such sale"; and on the same
day the treasurer made out and delivered to the city

three certificates of sale, one for each lot in which it was stated "that the purchaser will be entitled to a deed three years from the date of sale, unless redemption thereof be made." Each lot was sold to the city for $168.05.

Section 148 of Chapter 14 in part reads as follows:

"The purchaser at any sale authorized in this section acquires a lien on the properties so bid in by him for the amount paid at such sale as well as for all taxes and delinquent assessments, or delinquent installments thereof, and certificates of delinquency, and all interest, penalties, costs and charges thereon whether levied previously or subsequently to such sale, and whether for state, county, city, or school district purposes, subsequently paid by him on such property, and shall be entitled to interest at the rate of twelve (12) per cent. per annum on the original amount paid by him from the date of said sale, and upon such subsequent payments from the date of the payment of the respective amounts."

Any property, "so sold for an assessment shall be subject to redemption" at any time within three years from the date of the sale

"upon the payment to the treasurer for the purchaser of the amount for which the same was sold, with interest at the rate of twelve (12) per cent. per annum, together with all taxes and special assessments, interest, penalties, costs and other charges thereon paid by the purchaser of such property at or since such sale, with like interest thereon."

If redemption is made within three years

"the treasurer shall, on demand of the purchaser or his assigns, and the surrender to him of the certificate of sale, execute to such purchaser or his assigns, a deed for the property therein described; Provided, that no such deed shall be executed until the holder of such certificate of sale shall, according to the records in the office of the county recorder, have notified the owners of such property that he holds

such certificate, and that he will demand a deed therefor. Said notice shall be given by personal service upon said owners: Provided, that in case said parties are non-residents of the state or cannot be found therein after diligent search, that such notice may be given by publication once a week for three successive weeks. Such notice and return thereof, with the affidavit of the person, or in case of the city of the recorder, claiming such deed showing that such service was made, shall be filed with the treasurer.''

If notwithstanding such notice redemption is not made then sixty days after the date of service or the date of the first publication of notice

''the holder of such certificate of sale shall be entitled to a deed thereon.'' However, such deed ''shall be executed only for the property described in the certificate, and after payment of all delinquent taxes and special assessments thereon, or installments thereof, the certificates of delinquency or other certificates issued for special or local assessments, whether the same were levied, assessed or issued prior or subsequent to the issuance of said certificate of sale: Provided, that any such deed may be issued to the city for the face amount for which said certificate of sale was issued, plus accrued interest, costs, penalties and charges, and shall be held by the city subject to the liens of general taxes and special assessments.''

Section 154 of Chapter 14 in part reads as follows:

The ''deed shall be *prima facie* evidence that the property was assessed according to and as required by law; that the assessment was not paid; that the property was sold as required by law; that it was not redeemed; that due notice of demand for deed had been given, and that the person executing the deed was the proper officer; and the deed shall be conclusive evidence of the regularity of all other proceedings from the assessment, up to and including the execution of the deed, and shall convey the entire fee

simple title to the property therein described, except
as otherwise provided herein for the city stripped of
all liens and claims except taxes and assessments for
local improvements or installments thereof, not de-
linquent.

"Such deed at the expiration of one year from its
issuance, shall in all respects become absolute, and no
suit or action of any kind or character shall be main-
tained or shall set aside or annul the sale of said
property for said lien."

By the terms of Section 144 of Chapter 14 the
council was required by ordinance to create a con-
solidated improvement district comprising all im-
provements previously made "where any special
assessments remain unpaid and shall create a con-
solidated improvement fund comprising the same."
The council was authorized by Section 146 to issue
the Refunding Improvement Bonds of the city

"to take up and pay the total amount of the out-
standing and unpaid Improvement Bonds and war-
rants of said city previously issued for street im-
provements by paving or otherwise, including sewers
and water mains, and to reimburse said city for ad-
vances made by it from taxes and otherwise from its
various funds to meet from time to time maturing
payments on said bonds and warrants."

The proceeds derived from the sales of the Refund-
ing Improvement Bonds shall

"be paid by the purchaser to the city treasurer and
shall be applied to the redemption and payment of
said outstanding and unpaid city of Medford Im-
provement Bonds and warrants and to the reimburse-
ment of the several funds of said city for advances
made to meet maturing interest payments on said
bonds and warrants as aforesaid."

According to Section 151:

"All sums paid upon assessments shall be paid to the city treasurer and by him credited to the consolidated fund."

Section 153 authorizes the city to sell properties deeded to it "under and by virtue of any proceedings mentioned in" Chapter 14, and it is further provided that the proceeds derived from such sales shall be paid by the treasurer "into the consolidated improvement fund."

The Bancroft Bonding Act requires that the words "Improvement Bond" shall appear on the face of every bond issued under that act: Section 3791, Or. L. Pursuant to the authority of Chapter 14, Refunding Improvement Bonds were sold and the proceeds used to retire all the "Improvement Bonds" previously issued under the Bancroft Bonding Act; so that now there are no outstanding Bancroft bonds. Furthermore, no new assessments have been levied. The Refunding Improvement Bonds are based upon the same assessments as were the Improvement Bonds issued under the Bancroft Bonding Act; and these assessments, if still enforceable, are assets of the city with which to pay the Refunding Improvement Bonds; and although Chapter 14 requires that each Refunding Improvement Bond shall provide that the principal and interest shall be payable out of the consolidated improvement fund it is further declared in the amendment that if that fund should prove insufficient, the full faith, credit and resources of the city are pledged for the payment of the principal and interest whenever due.

The complaint is in the form usually found in suits to quiet title. The answer gives a detailed account of all that occurred from the levying of the assessment on the three lots to the sale of the lots to the

city, and concludes with the declaration that the city intends to give the notice required by Chapter 14, and, unless redemption is made, to cause deeds to be made conveying the three lots to the city. The reply admits all of the facts which make up the history of the assessment and sale of the lots, but denies that Chapter 14 conferred lawful authority to sell the lots, and denies that Chapter 14 is municipal legislation within the meaning of the state Constitution. The reply does not attempt to point out wherein Chapter 14 is unconstitutional. The plaintiff does no more than to assert in the most general terms that the charter amendment is invalid.

It is admitted that the assessment proceedings were regular and that when Nagle made application under the Bancroft Bonding Act the city "had a valid and subsisting lien against" the three lots. It is admitted that all the proceedings subsequent to the effective date of Chapter 14 were strictly in conformity with the procedure prescribed by that charter.

1, 2. The first objection made by the plaintiff is that Chapter 14 is invalid because the provisions for a consolidated lien docket and a Consolidated Improvement Fund conflicts with the Bancroft Bonding Act (Section 3793, Or. L.), which provides for an "Improvement Bond Sinking Fund" and an "Improvement Bond Interest Fund." The purpose of Section 3793, Or. L., is to provide a separate fund which shall be primarily available for and applicable to the redemption of bonds issued under the Bancroft Bonding Act; but this provision of the Bancroft Bonding Act does not, in the attending circumstances, affect Chapter 14, for the reason that all the bonds issued under the Bancroft Bonding Act have been redeemed and not one is now outstanding. The purpose of

Section 3793, Or. L., is to assure the payment of the Bancroft bonds and that purpose has been completely accomplished.   The money with which that purpose was accomplished was obtained by selling Refunding Improvement Bonds; and in order that those bonds may in turn be paid, provision is made by Chapter 14 for a fund known as the Consolidated Improvement Fund.   Nor does Chapter 14 attempt to dispense with the bond lien docket required by the Bancroft Bonding Act.   Lots governed by the Bancroft Bonding Act still appear on the bond lien docket provided for by that act, and every installment, if paid when it becomes due, is paid on that docket; but if an installment becomes delinquent, the city, permitted as it is to employ its own processes to enforce payment of delinquent installments, collects the delinquent installment by employing the consolidated lien docket and the processes prescribed by the charter.   The first objection of the plaintiff cannot be sustained.

3, 4. It is next contended that Chapter 14 is invalid because Section 159 provides as follows:

"Whenever any property situate in the city shall be offered for sale for general taxes, the city shall have the power to protect the lien or liens of any local assessments outstanding against the whole or any portion of such property by purchase or otherwise."

Even though it be assumed, without deciding, that Section 159 is invalid, such assumed fact would not destroy the remainder of Chapter 14; for the reason that Section 159 could be entirely removed without affecting the remainder of the amendment.   If the charter amendment as a whole would be destroyed by Section 159, if that section were invalid, then the question of the validity of Section 159 would be pre-

sented; but, since the remainder of the chapter would stand even though Section 159 were invalid, the question is not necessarily here for decision. The record does not inform us whether the city has paid any general taxes on any of the three lots to protect the lien of any local assessment. Moreover, the legis-- lature by the enactment of Chapter 239, Laws of 1919 (Section 4344, Or. L.), expressly empowered cities having liens upon any real property included in a certificate of tax delinquency to use the funds of the city for the redemption of such property; and the city may become a bidder and purchaser at the sale of any property under the foreclosure of a tax delinquency certificate against which property the city claims a lien. This statute is state-wide in its application; it is written into the charter of every city in the state; and the power so written into every city charter may at any time be exercised by any city.

5, 6. It is next claimed that Chapter 14 is invalid because section 150 provides that the certificate of sale

"shall be delivered to the purchaser, and shall be by such purchaser recorded in the office of the county recorder within thirty (30) days from the date thereof. If not recorded within said time, the lien thereof shall be postponed to claims of subsequent purchasers and incumbrancers for value and in good faith who become such while the same is unrecorded."

The question of the validity of the quoted portion of Section 150 cannot possibly affect the validity of Chapter 14 as a whole. The manifest purpose of the challenged portion of Section 150 is to attempt to fix the rights between the holder of a certificate of sale and subsequent purchasers or owners of encumbrances. It is conceded that the plaintiff stands in Nagle's shoes and that her rights are not higher than

those which could be asserted by Nagle if he had never sold to the plaintiff. The present controversy is not between the holder of a certificate of sale and a subsequent purchaser such as is mentioned in Section 150. Stated in broad terms and without attempting to attain technical exactness, the city can as part of its prescribed procedure require the recording in the office of the county recorder of any paper which it would, by force of state law, be the duty of that officer to record if presented by any individual; but cities cannot, in the exercise of the initiative and under the guise of municipal legislation expand the duties of state or county officers beyond the limits fixed by state laws: *West Linn* v. *Tufts,* 75 Or. 304 (146 Pac. 986). However, so far as the instant case is concerned it may be assumed, without deciding, that in the particular mentioned Section 150 is invalid; and yet such assumption will not enable the plaintiff to prevail, nor will it in any degree affect the remainder of Chapter 14.

7. The last charter enacted by the legislative assembly for Medford is found in Special Laws, 1905, page 989. The charter authorized the city to compel payment of an assessment by sale of the property charged with such assessment. Section 87 provided for the issuance of a certificate of sale and reserved to the owner the right to redeem in the manner and with like penalties as provided by the general laws of the state for redemption from tax sale, and further provided that at the expiration of two years from sale the owner of the certificate could apply to the recorder and receive a deed; and at the expiration of a year from its issuance the deed became absolute. Chapter 14 expressly repealed Section 87 of the act of 1905 and the subject matter embraced by Section

87 of the charter of 1905, is covered by Section 150 of Chapter 14. The question as to whether or not such legislation is "municipal" in character will be hereafter discussed; but, assuming that it is "municipal" in character, the power of the city so to amend its charter so plainly and manifestly exists that further discussion would be a work of supererogation.

8. The certificates of sale which were delivered to the city were recorded; and it is claimed that these certificates were not entitled to be recorded, because they were not acknowledged as required by the state law. The fact remains, however, that the certificates of sale were recorded; and, moreover, as between the plaintiff and the city the rights of the holder would not be affected if the certificates had not been recorded, nor would the rights of the city be lessened in any respect if the recordation of the certificates were treated as being utterly void.

9. The contention that property cannot be struck off to the city, even though no person bids enough to pay the assessment, because it results in taking property from the tax-roll to the injury of the taxpayer is disposed of adversely to plaintiff by the conclusion reached in *Colby* v. *City of Medford,* 85 Or. 485, 529 (167 Pac. 487).

10–12. Finally it is insisted that Chapter 14 is void because, taken as a whole, it is not within the scope of municipal authority; and particularly because of such provisions as Section 154 prescribing the notice which is to be given in order to entitle the owner of a certificate of sale to receive a deed, and Section 148 declaring that the purchaser at a sale for delinquent assessments acquires a lien, and Section 150 providing for the issuance of a deed.

The whole sum of intramural power is set at large by the state Constitution (Article IV, Section 1–a and Article XI, Section 2), and the legal voters of any city may, by amending their existing charter or by the enactment of a new charter, reach out and take either all or only a part of that whole sum of power: *State ex rel.* v. *Port of Astoria,* 79 Or. 1, 18 (154 Pac. 399). It must be remembered that we are not considering a charter granted by the legislature and that the question for decision is not whether the language of the charter is broad enough to include the power claimed by the city; but the question for decision is whether the legal voters of Medford had the right under the present form of our state Constitution to do what they have at least attempted to do.   Without doubt the legislature could prior to 1906 have enacted for any given city a charter containing the power to sell and to deed land charged with a special assessment.   The legal voters of Medford have by the enactment of Chapter 14 amended their charter, and to the extent that such amendment embraces intramural power it must be held to be a valid exercise of municipal authority: *State ex rel.* v. *Port of Astoria,* 79 Or. 1, 17 (154 Pac. 399).   It may be fairly assumed that none would be so bold and so unreasonable as to claim that the power of paving streets or that the power of laying sewers at the expense of the adjacent property was not an intramural power.   We have been so accustomed everywhere to find cities and towns paving streets and laying sewers and assessing the cost of such improvements against the adjacent property that all minds at once and without hesitation recognize such powers to be among those which appropriately and peculiarly belong to cities and towns.   They are essentially and distinctively intra-

mural and municipal in character. The exercise of those powers by cities and towns has been the rule and not the exception; hence if the universal usage which prevailed prior to 1906, the date of the amendment of our state Constitution, is to be regarded as a controlling or merely as a persuasive factor, only one conclusion can be reached. If it be conceded, as it must be, that the power to pave streets and the power to lay sewers at the expense of the adjacent property exists, then it must be further conceded that the right to enforce those powers also exists. An examination of the city charters granted by the legislature prior to 1906 will disclose that in nearly all of such charters the power to improve streets and the power to lay sewers were expressly granted together with the power to assess the cost of the improvements against the adjacent property; and almost invariably whenever the power to pave and the power to assess were granted it was accompanied by the power to enforce payment by sale of the property. Unless the power to levy an assessment is fortified by the power to compel payment by sale of the assessed property, exercise of the power to levy assessments becomes futile and ineffective. In some charters granted by the legislative assembly and empowering the city to sell, as in the Medford Charter of 1905, a deed was issued upon the expiration of a prescribed period after the sale. The owner could redeem before the fixed time, but not thereafter. In other charters enacted by the legislature and empowering the city to sell, a certificate of sale was issued and the procedure prescribed was a suit to foreclose the lien. In this class of charters as in those where a deed was issued, the owner could redeem before a fixed time, but not thereafter. In both classes

of charters redemption was permitted; and so, too, in both kinds of charters the owner of a certificate of sale, as between himself and the person against whose property the assessment was levied, became upon the expiration of the period for redemption, the absolute owner of the property. But whether the process was by the issuance of a deed or by a suit in foreclosure, it was nothing but a mode of procedure. Each provided for due process of law; for that was the *sine qua non.* As before stated the whole sum of municipal power is made available to cities and towns. Among the powers so available are the power to improve streets and the power to assess the cost against the adjacent property; and stated in general terms those powers include the further power to employ such modes of procedure as are appropriate and necessary for effectively exercising them. The Code provides that liens may be foreclosed by suits; but it does not follow that the lien of a street assessment must be foreclosed by a suit rather than by a deed issued after compliance with the due process of law clause of the Constitution.

13, 14. The power to tax is an attribute of sovereignty; and the power to levy a special assessment, although it is to be differentiated from a pure tax, is a branch of the power of taxation, and when exercised is a manifestation of sovereignty: *Colby* v. *City of Medford,* 85 Or. 485, 525 (167 Pac. 487); *Brown* v. *Silverton,* 97 Or. 441, 454 (190 Pac. 971). The power to sell land for a delinquent special assessment charged against the land is, as expressed in *Williams* v. *Cammack,* 27 Miss. 209 (61 Am. Dec. 508, 517),

"a means to an end, legitimate and proper in itself— a mere incident to the power of taxation, and a

remedy for its enforcement without which the power itself would fail.''

See also 25 R. C. L. 183.

15. The lien of an assessment may be enforced by an ordinary suit in equity for the foreclosure of a lien, or it may be enforced by the very common summary method of sale of the land and execution of a deed: *Carstens & Earles* v. *Seattle,* 84 Wash. 88 (146 Pac. 381, Ann. Cas. 1917A, 1070); 25 R. C. L. 183.

If a city charter goes no further than to provide for an assessment accompanied by a lien, and is silent as to the method of enforcing the lien, the city can, whether the charter be one enacted by the legislature or by the legal voters of the city, avail itself of an ordinary suit in equity for the foreclosure of the lien, because the courts are open to the foreclosure of liens. In these circumstances, the city does not attempt to impose duties upon state courts or to direct and control state instrumentalities; but the city is in such a case availing itself of processes and of a remedy already provided by state law. Since the power to enforce the lien of an assessment is incident to the power to levy the assessment a procedure which will adequately furnish due process of law will usually be sufficient. Prior to 1906 the legislature could enact a special charter and empower a city to use its own instrumentalities and processes for the enforcement of the lien of the assessment by authorizing the city to sell and to deed delinquent land; or the legislature could authorize the city to use municipal instrumentalities and processes to a given stage, then to be followed to completion by the employment of state instrumentalities and processes. In the instant case the legal voters of Medford have prescribed a mode of procedure which in all its con-

trolling particulars includes the use of none but municipal instrumentalities and meets all the requirements of the due process of law clause of the Constitution.

.The power to levy a special assessment is one which is concededly municipal in character and intramural in scope, and therefore is one which the legal voters of a city may under the Constitution take unto themselves. Accompanying this power and as an incident to it is the power of enforcement. This incidental power of enforcement may be exercised by the employment of municipal processes and municipal instrumentalities, and it does not necessarily require the employment of any state processes or instrumentalities; and if, as in the instant case, municipal instrumentalities and processes are employed, such incidental power of enforcement can be said to be municipal in character and intramural in scope and therefore a power which the legal voters of a city may incorporate in their charter.

16. In order to avoid the possibility of any misunderstanding about our holding with reference to the right of the city to foreclose a lien by a suit in the Circuit Court, it is proper to add to what we have already stated that in *Colby* v. *City of Medford,* 85 Or. 485, 529 (167 Pac. 487), we directed attention to the fact that the procedure attempted to be prescribed by the Hanson Plan contained some features which probably could not be sustained; for the reason that the power of the legal voters of a city is limited to the enactment and amendment of their municipal charters and to the enactment of "local, special and municipal legislation." Among the objectionable features alluded to was one whereby the city attempted not merely to provide for the foreclosure of an assess-

ment lien by a suit in the Circuit Court but also to prescribe the procedure to be followed in the suit, to declare what constituted a sufficient complaint, to specify the persons who could be joined as defendants, to direct the manner of entering "judgment," and to declare the effect of such "judgment." Using the term "process" in the sense that it means "the whole course of proceedings in a cause * * from the original writ to the end of the suit" (Century Dictionary) we may appropriately say that a suit in the Circuit Court is a state process governed by the Constitution and state laws, and that the Circuit Court is a state instrumentality which is likewise governed by the Constitution and state laws. In all proper cases a city can avail itself of state processes and instrumentalities just as can a private person; but a city cannot by its own legislation regulate the procedure to be followed in a suit for the foreclosure of a lien, nor direct the course to be followed by a state instrumentality such as the Circuit Court.

17, 18. Our conclusion is that the legal voters of Medford had the right in the exercise of the initiative so to amend their charter as to provide for the sale of property charged with the cost of the street improvement, for the issuance of a certificate of sale and to make it a lien, for a period of redemption, and for the issuance of a deed. We do not attempt to determine whether Chapter 14 is valid in all its minor details; for the reason that the decision of questions which are not specifically noticed in this opinion and which may arise out of merely incidental and subordinate provisions must be postponed until a case is presented requiring a decision. However, in all its essential and material features, Chapter 14 is valid and constitutional; and unless the plaintiff redeems

the three lots within the time prescribed by Chapter 14 the city will be entitled to deeds for them.

The decree is affirmed.

AFFIRMED.   REHEARING DENIED.