Argued and submitted October 9, 1998; resubmitted en banc September 8, 1999,
reversed and remanded in part; otherwise affirmed January 26, 2000

David SIMS,
*Appellant,*
*and*

CITY OF PORTLAND,
a municipal corporation,
*Intervenor-Appellant,*

*v.*

BESAW'S CAFÉ,
and Besaw's Café,
an Oregon corporation,
*Defendants,*
*and*

Richard G. BEASLEY,
individually and dba Besaw's Café,
and all predecessors and successors in interest,
*Respondent.*

(9611-08970; CA A99868)

997 P2d 201

Madelyn Wessel, Chief Deputy City Attorney, argued the cause and filed the brief for intervenor-appellant City of Portland.

Craig A. Crispin filed the briefs for appellant David Sims. With him on the briefs were Shelley D. Russell and Crispin & Associates.

Charles W. Carnese argued the cause and filed the brief for respondent Richard G. Beasley, individually and dba Besaw's Café.

Lynn R. Nakamoto and Markowitz, Herbold, Glade & Mehlhaf, P.C., Portland, filed a brief *amicus curiae* for the American Civil Liberties Union Foundation of Oregon, Inc.

Before Deits, Chief Judge, and Edmonds, De Muniz, Landau, Haselton, Armstrong, Linder, Wollheim, Kistler, and Brewer, Judges.

ARMSTRONG, J.

Linder, J., concurring.

Edmonds, J., dissenting.

## ARMSTRONG, J.

The City of Portland adopted an ordinance that prohibits Portland employers from discriminating against employees and prospective employees on a number of bases, including on the basis of sexual orientation. The ordinance implements the prohibition by providing people who are harmed by that conduct with a cause of action to redress the harm. The trial court held that Portland lacked authority to give people a cause of action that they could litigate in state court. We disagree with that conclusion and reverse, in part, the court's judgment.

Plaintiff filed an action for employment discrimination against defendant[1] in circuit court that alleged claims under the Portland ordinance, under a state statute, and under state tort law. Because plaintiff sought and defendant opposed a declaration that plaintiff could pursue a claim in state court under the Portland ordinance, the court allowed the City of Portland to intervene in the action to assert a claim for declaratory relief on the validity of its ordinance.[2] The court ultimately concluded that the city could not create a cause of action that plaintiff could litigate in state court. Based on that conclusion, the court dismissed the claims by plaintiff and the city under the Portland ordinance, and plaintiff stipulated to the dismissal of his state statutory claim.[3] We conclude that the court erred in dismissing two of

---

[1] Plaintiff sued two defendants: Richard Beasley dba Besaw's Café and Besaw's Café, Inc. Only the former is a party to the appeal, so we refer to him as defendant.

[2] *See* ORS 28.110 (gives municipalities the right to become parties and be heard in declaratory judgment proceedings in which the validity of their charters, ordinances, or franchises is at issue).

[3] Plaintiff based his first claim on a state statute, ORS 659.030, and his second claim on the Portland ordinance. He based his third claim on the proposition that the court should treat a violation of the Portland ordinance and the state statute as a "statutory tort." Finally, he sought in his fourth claim a declaration that he could bring his first three claims. The trial court apparently viewed its decision on Portland's authority to create a cause of action, and plaintiff's decision to withdraw his claim under the state statute, as controlling whether plaintiff could state a claim for a statutory tort and, in turn, whether he was entitled to a declaration that he could bring any of his claims. Hence, it dismissed plaintiff's statutory tort claim and his claim for declaratory relief when it dismissed plaintiff's other two claims. Even if the court were correct about Portland's authority to create a cause of action, the court nevertheless erred in dismissing plaintiff's and the city's claims for

plaintiff's four claims and in dismissing the city's claim for declaratory relief.

Portland's charter gives the Portland City Council broad legislative authority. Defendant does not dispute that that authority includes the authority to prohibit employment discrimination by Portland employers. Indeed, defendant concedes that the city acted within its authority in enacting its anti-discrimination ordinance, except for its decision to include in the ordinance the provision that gives people "a cause of action in any court of competent jurisdiction" for harm that they suffer as a result of ordinance violations. Defendant raises a series of arguments against the validity of that provision. We address them in turn.[4]

---

declaratory relief. That is because the proper disposition of the declaratory relief claims was not to dismiss them but to declare the parties' rights. *See, e.g., Burks v. Lane County,* 72 Or App 257, 260, 695 P2d 1373 (1985); *Harrison v. Port of Cascade Locks,* 27 Or App 377, 379 n 1, 556 P2d 160 (1976), *rev den* 277 Or 1 (1977).

[1] The concurrence goes beyond the arguments raised by defendant to explore the general authority of Oregon cities to enact legislation. Contrary to the concern expressed by the concurrence, our decision does not imply that cities are free to modify private law in whatever manner they choose, so long as their charters give them that authority. The authority that cities can exercise is limited by the applicable state and federal law that bears on that authority. On that issue, we note that, before the people amended the Oregon Constitution to give themselves the power to enact municipal charters for their cities, the legislature performed that task. *See generally LaGrande/Astoria v. PERB,* 281 Or 137, 140-45, 576 P2d 1204, *adhered to on reh'g* 284 Or 173, 586 P2d 765 (1978). In doing that, the legislature could adopt a charter for a city that gave the city government legislative power that was limited only by the limits imposed by the state and federal constitutions. Nothing suggests that the shift from the legislature to local citizens as the body responsible for enacting city charters served to limit the legislative power that a charter could give a city government to exercise. In addition to any other constitutional limits, there are limits imposed by state preemption on the exercise of legislative power by cities, which we discuss in relation to defendant's challenge to Portland's anti-discrimination ordinance and under which the policy choices made by the state legislature or voters prevail over local policy choices on substantive matters. *See, e.g., id.* at 156. If the relevant charter gives the city the power to enact the legislation at issue, the question of the city's authority to enact the legislation will then turn on the limits imposed by state and federal law on that authority. *See id.* at 142. Both we and the concurrence agree that there is no limit of which we are aware in either source that denies to Portland the authority to adopt legislation to regulate the conduct of Portland employers toward their employees and to give people harmed by that conduct a claim for that harm.

The dissent contends that our decision gives cities the authority to override "the will of the legislature or the people" regarding the effect to be given municipal law in state court. 165 Or App at 211. There is no basis for that assertion. As we explained above, it is well established that state substantive law preempts municipal law if the state law is intended to have that effect. *See, e.g., LaGrande/Astoria,* 281 Or at 156. Consequently, the legislature and the people, through the initiative,

■   Defendant first contends that the provision constitutes an impermissible delegation of the city's "police power,"[5] because it authorizes private people, as opposed to city officials, to bring proceedings to enforce the ordinance. Defendant confuses law making with law enforcement. The authority that the Portland charter gives the city council to enact laws pursuant to the "police power" cannot be delegated by the council to others to exercise.[6] The same prohibition applies to the delegation of legislative power by the state legislature.[7] However, the prohibition against the delegation of law-making power has no application to legislative decisions about who can enforce the policies that the legislative body has chosen to establish. Defendant cites no authority and offers no analysis, and we are unaware of any, that supports the proposition that Portland impermissibly delegated its "police power" by giving people who are harmed by violations of its anti-discrimination ordinance a cause of action to redress the harm.

■   Defendant next contends that Portland lacks authority to give people a cause of action that can be litigated in state court because the creation of such a cause of action would add to the jurisdiction of the state courts, and only the state legislature can do that. Defendant is correct that local governments lack authority to change state court jurisdiction. He is mistaken, however, in believing that Portland's

have the power to deny to cities the authority to modify private law or to affect the law that is used by state courts to adjudicate private disputes. *See, e.g., de Parrie v. State of Oregon*, 133 Or App 613, 618-19, 893 P2d 541, *rev den* 321 Or 560 (1995) (state statute can preempt municipal authority to enact substantive law on a subject even though the state statute does not, itself, establish substantive policy on the subject). Nothing that we have said raises any question about the preemptive effect of state statutory or constitutional law or is inconsistent with our recent treatment of that issue in *State v. Logsdon*, 165 Or App 28, 995 P2d 1178 (2000).

[5] Among other things, the Portland charter gives the city council the power to "exercise within the City of Portland all the powers commonly known as the police power." Consequently, it is appropriate to use that term to describe one facet of the city's law-making authority. We note, however, that the term can be misleading as a general description of governmental law-making authority. *See, e.g., Dennehy v. Dept. of Rev.*, 305 Or 595, 604 n 3, 756 P2d 13 (1988).

[6] *See, e.g., Brinkley v. Motor Vehicles Division*, 47 Or App 25, 27, 613 P2d 1071 (1980).

[7] *See, e.g., Hillman v. North. Wasco Co. PUD*, 213 Or 264, 276-81, 323 P2d 664 (1958), *overruled on other grounds by Maulding v. Clackamas County*, 278 Or 359, 365, 563 P2d 731 (1977).

creation of a cause of action that can be litigated in state court does that.

There have been instances in which Oregon cities have exceeded their authority by enacting ordinances that purported to give state courts authority to perform functions that they had not been authorized by state law to perform. In *La Grande v. Municipal Court et al.*, 120 Or 109, 251 P 308 (1926), for example, the La Grande charter gave people convicted of municipal offenses the right to appeal their convictions from municipal court to the local state circuit court. The Supreme Court had previously held that the provision in original Article VII, section 9, of the Oregon Constitution, that gives circuit courts appellate jurisdiction over lower tribunals is not self-executing, which meant that additional law had to be adopted to give circuit courts authority to hear municipal appeals. *See La Grande*, 120 Or at 116 (quoting *Kadderly v. Portland*, 44 Or 118, 74 P 710 (1903)). All that *La Grande* held was that the additional law had to be state rather than municipal law. In other words, the court held that the city could not assign a function to the local state circuit court—serving as the appellate court for the La Grande municipal court—that the state had not authorized the state court to perform.

*Lines v. City of Milwaukie*, 15 Or App 280, 515 P2d 938 (1973), *rev den* (1974), applied the same principle. It involved a city charter that gave the circuit court appellate jurisdiction over the decisions of a city civil service commission. We held that the city lacked authority to add to the jurisdiction of the state courts and that the grant by the city to the circuit court of appellate jurisdiction over the city's civil service commission decisions had done that. *See also Wong Sing v. Independence*, 47 Or 231, 234, 83 P 387 (1905) (applied same principle).

Here, in contrast, the Portland ordinance does not purport to confer any jurisdiction on state courts or to assign any function to them. It provides only that people harmed by violations of it "shall have a cause of action in any court of competent jurisdiction." Whether the state circuit court *is* a court that has jurisdiction to adjudicate such a claim is an issue that we must address, but that is a different issue from

the one presented in *La Grande* and *Lines* on whether cities can directly assign to state courts functions that they have not been authorized by state law to perform.[8]

■     As to the jurisdictional issue, we conclude that the state circuit court has jurisdiction to adjudicate a claim under the Portland ordinance. Except to the extent that it has been modified by statute, original Article VII, section 9, of the Oregon Constitution, is the source of circuit court jurisdiction. *See* Or Const, Art VII (Amended), § 2. It provides:

> "All judicial power, authority, and jurisdiction not vested by this Constitution, or by laws consistent therewith, exclusively in some other Court shall belong to the Circuit Courts, and they shall have appellate jurisdiction, and supervisory control over the County Courts, and all other inferior Courts, Officers, and tribunals."

No statute of which we are aware has changed that grant of jurisdiction in a way that is relevant to this case.

■ ■     The judicial power identified in that provision includes the power to adjudicate civil, or private-law, disputes without regard to the source of the law. As long as a circuit court has personal jurisdiction over the parties, the parties can litigate claims based on the law of this and other states, of the United States, and of foreign countries.[9] There are court-created principles that bear on the manner and extent to which an Oregon circuit court will adjudicate a private dispute based on foreign law, but the court has jurisdiction to do it.

    *Aldrich v. Anchor Coal Co.*, 24 Or 32, 32 P 756 (1893), illustrates the principle. *Aldrich* involved a claim by a contractor against a stockholder of a California corporation

---

[8] In defendant's view, the creation of a cause of action that can be litigated in state court adds to the jurisdiction of the state court. If that were true, then it would mean that state courts would change their own jurisdiction whenever they recognized a new cause of action or eliminated an existing one. Such a change in the law normally is not considered to change a court's jurisdiction, unless the affected court's jurisdiction is limited in some way, such that recognition of a new cause of action would expand its jurisdiction beyond that authorized by the granting authority.

[9] Actions involving disputes with which the state has no connection other than jurisdiction over the parties are referred to as transitory actions. The state judicial power extends to the adjudication of transitory actions.

for a debt allegedly owed by the corporation to the contractor. The contractor based its claim on a California statute that made stockholders of California corporations individually liable for their proportionate share of corporate liabilities. It was not a claim that was cognizable under Oregon law, and the trial court dismissed it on that basis. The Supreme Court reversed, holding that the court had authority to adjudicate the claim:

> "The [California] statute indeed creates a new right and liability not existing at common law, but [it] does not prescribe a peculiar remedy for its enforcement; it only declares that it may be enforced by action, leaving the creditor to select such common-law remedies as may be in use in the jurisdiction where the suit is brought to enforce such liability. * * * Where a liability * * * is created by statute, without making the procedure for its enforcement, as it were, a part of the liability, we cannot see why it should not be enforced in any court having jurisdiction of the subject matter and the parties."

*Aldrich*, 24 Or at 38.[10]

---

[10] The effort by the dissent to distinguish *Aldrich* from this case reveals a fundamental flaw in the dissent's analysis. *See* 165 Or App at 212-14. The liability that the *Aldrich* statute imposed on stockholders to pay corporate obligations was not a liability that the common law would recognize, so there was no common-law remedy available to the plaintiff for that liability. However, the statute that imposed the liability did not specify a remedy for it, so the court could supply a remedy from among the normal common-law remedies that were available to it for such a liability by, for example, awarding damages.

We can assume, for these purposes, that the common law imposes no liability for the discriminatory conduct that the Portland ordinance proscribes. Because the common law imposes no liability for that conduct, it necessarily provides no remedy for it. The Portland ordinance imposes liability for the conduct. However, as in *Aldrich*, it leaves it to the courts to supply remedies for that liability from among the appropriate remedies that are available to them, again, for example, by awarding damages. In the dissent's view, the Portland ordinance is invalid because it gives people *a* remedy for conduct for which the common law would not impose liability even though the ordinance does not specify *what* remedies flow from the liability. If that were a correct understanding of the relevant principles, then *Aldrich*, itself, was wrongly decided, because it, too, gave people *a* remedy in circumstances in which the common law would not give them one. At bottom, the dissent is founded on a fundamental failure to distinguish between legislation that imposes liability in circumstances in which the common law would not and legislation that provides "peculiar" remedies for the liabilities that it imposes. The legislation at issue in *Aldrich* and this case is legislation of the former type. It did not, and does not, run afoul of any principle of which we are aware. *See also Aldrich*, 24 Or at 38 (peculiar remedy that prevents adjudication of cause of action is one that forum is "incapable of administering").

■ Oregon municipal law also is a source of law that an Oregon circuit court can apply in adjudicating a private dispute. In other words, it is within the judicial power of the circuit court to adjudicate a private dispute that arises under Oregon municipal law. Consequently, the circuit court is a "court of competent jurisdiction" to adjudicate a claim under the Portland ordinance.

■ The dissent does not dispute that the circuit court has jurisdiction to adjudicate a claim under the Portland ordinance. In its view, however, Portland exceeded its authority by creating a cause of action that could be litigated in circuit court, because the creation of the cause of action imposes an obligation on the court to adjudicate claims that it would not otherwise be required to adjudicate. The dissent is correct that Oregon municipalities infringe on state sovereignty, and thereby act beyond their authority, by requiring or authorizing state officials to perform functions that they have not been authorized by state law to perform. The dissent is wrong, however, in its belief that Portland's creation of the cause of action at issue in this case runs afoul of that principle.

The dissent principally relies on two Oregon cases as support for its position. One of them is *La Grande v. Municipal Court*, which we have discussed above. The other is *City of Eugene v. Roberts*, 305 Or 641, 756 P2d 630 (1988). That case involved an effort by the City of Eugene to place an advisory question on a state election ballot. The court concluded that the proposed question was not one that state statutes authorized the relevant state and county election officials to place on the ballot. The city argued, however, that its status as a home rule city gave it the authority to require county officials to place the question on the ballot. The court rejected that argument, reasoning that the city's home rule power did not give it the power "to conscript the services of county and state officials in the conduct of city business." *Id.* at 650. In other words, the city could not require the election officials to do something that state law did not authorize them to do.

The court considered *Wilson v. City of Medford*, 107 Or 624, 215 P 184 (1923), to provide direct support for its *City of Eugene* decision:

"There, an ordinance of the City of Medford purported to require the county recorder to record certain items on the county lien docket. This court said:

> " '* * * Stated in broad terms and without attempting to attain technical exactness, the city can as part of its prescribed procedure require the recording in the office of the county recorder of any paper which it would, by force of state law, be the duty of that officer to record if presented by any individual; but cities cannot, in the exercise of the initiative and under the guise of municipal legislation[,] expand the duties of state or county officers beyond the limits fixed by state laws * * *.'

"*Id.* at 643. (Citations omitted.) We find this analysis to be equally applicable here."

*City of Eugene*, 305 Or at 650 (citing additional cases, including *La Grande v. Municipal Court*).

In each of the cited cases, cities sought to require or authorize state officials to perform functions that they had not been authorized by state law to perform. Here, in contrast, the challenged Portland ordinance does *not* add to the circuit court's authority to adjudicate claims. One of the basic functions of the circuit court is to resolve disputes over harm caused to people as a result of failure by others to conform their behavior to the requirements of law. Therefore, independently of the Portland ordinance, the circuit court has authority to adjudicate a claim by an employee of a Portland employer for harm caused by discriminatory treatment by the employer on the basis of sexual orientation. Leaving aside for these purposes the effect of ORS 659.030,[11] that claim might fail because employment discrimination on that basis is not unlawful. Nevertheless, the claim is one that the circuit court has authority to hear. The effect of the Portland ordinance is to change the law that bears on such a claim, making it one on which the employee *can* prevail, but it does not add to the function or duties of the circuit court for the court to adjudicate the claim.

---

[11] ORS 659.030 prohibits certain employment practices, the violation of which can give rise to a claim that can be litigated in state court. *See, e.g., Tanner v. OHSU*, 157 Or App 502, 971 P2d 435 (1998). The claim by plaintiff that the court dismissed by stipulation was a claim based on ORS 659.030. *See* 165 Or App at 183-84 and note 3.

That contrasts with the situation presented in *La Grande, Lines, City of Eugene,* and *Wilson.* In each of those cases, cities had to change state law in order to permit the state officials to do what the cities wanted them to do. The cases held that the cities simply did not have the power to do that.

*La Grande, Lines, City of Eugene,* and *Wilson* essentially establish a principle that is the other side of that established in *State ex rel. Haley v. City of Troutdale,* 281 Or 203, 210-11, 576 P2d 1238 (1978), on the relationship between state and municipal law. *Haley* held that the policy choices made by the state legislature on civil matters are not presumed to preempt those made by cities. In contrast, the cited cases establish that the policy choices made by the state legislature regarding the *authority* of state officials *do* preempt the ability of cities to make different choices about the officials' authority. In *City of Eugene,* state election officials did not have authority to conduct votes on advisory measures. State law had to be changed to give them that authority. Municipal law could not do that. In *La Grande* and *Lines,* circuit courts did not have authority to hear appeals from municipal courts or commissions. State law had to be changed to give them that authority, and, again, municipal law could not do that. Here, in contrast, circuit courts *do* have authority to adjudicate claims under Portland's ordinance. No state law has to be changed or enacted to give them that authority.[12]

---

[12] Of course, the issue framed in this case can be examined outside the context of court authority to adjudicate claims. Assume, for example, that the state employed building inspectors and charged them with inspecting new buildings to confirm that they were built according to the applicable building codes. Assume further that a city adopted a building code that required double-wall construction, while the state building code required only single-wall construction. *Haley* held that a city building-code requirement of that kind was not preempted by the state building code as a matter of then-existing state law. *Haley,* 281 Or at 205-11. If the state building inspector required conformance with the city's double-wall standard, then she would be enforcing the city's substantive law, but she would be performing the job that she had been assigned by the state to perform. In contrast, if the city adopted an ordinance that required state building inspectors to conduct inspections that they were not required by state law to perform, for example, inspecting commercial buildings when they were employed by the state to inspect only residential buildings, then the ordinance could not be enforced. *See, e.g., Wilson,* 107 Or at 648-50 (city could require state official to do job specified by state law but nothing more). All that the Portland anti-discrimination ordinance does is

The dissent also claims support for its position from McQuillin's treatise on municipal law. *See* 165 Or App at 216-17 (citing Eugene McQuillin, 6 *The Law of Municipal Corporations* § 22.01, 388 (3d ed 1998)). The dissent quotes the following statement by McQuillin, which the dissent identifies as stating the first of two rules that bear on the authority of cities to affect private law:

> " 'The well-established general rule is that a municipal corporation cannot create by ordinance a right of action between third persons *or* enlarge the common law or statutory duty or liability of citizens among themselves.' "

*Id.* at 215-16 (emphasis added).[13] The dissent treats the statement as if it dealt only with the authority of cities *to create* causes of action and not their authority *to affect* existing ones. But the statement addresses *both* issues and asserts that the "well-established general rule" is that cities lack authority to do either of those things. Oregon Supreme Court cases establish, however, that, contrary to McQuillin's view, Oregon cities *can* "enlarge the common law * * * duty or liability of citizens among themselves."

---

change the substantive law that state courts use to perform the adjudicative role that they have been assigned by state law to perform. It does not run afoul of any limit of which we are aware that is imposed on the enactment of municipal law.

[13] Not surprisingly, most of the cases that McQuillin cites as support for that rule do not, in fact, support it. For example, McQuillin cites *Yellow Freight Systems v. Mayor's Com'n*, 791 SW2d 382 (Mo 1990), as support for its contention that cities lack authority to create a private cause of action. McQuillin, at 338 n 1. However, the court based its holding in *Yellow Freight Systems* on a Missouri constitutional provision that governed the authority of Missouri municipal courts. It held that the provision prevented the city from using a commission, that is, an executive rather than a judicial forum, to award relief to people who were affected by violations of the city's civil rights ordinance. *Yellow Freight Systems*, 791 SW2d at 384-85. The court pointedly did not address whether the city could create a private cause of action that could be enforced in state court. *See id.* at 385-86.

The bulk of the other cases cited by McQuillin suffer from similar flaws. *See, e.g.*, *Delaney v. Superior Fast Freight*, 14 Cal App 4th 590, 18 Cal Rptr 2d 33 (1993) (state preemption made it unnecessary to decide if city could create cause of action for employment discrimination). The authority of cities to enact ordinances is derived from the grant of that authority in each state. Those grants differ dramatically. *See* Gary T. Schwartz, *The Logic of Home Rule and the Private Law Exception*, 20 UCLA L Rev 671, 681-97 (1973). Consequently, as Professor Schwartz noted in his comprehensive analysis of the authority of home rule cities to enact ordinances that affect private law, McQuillin and the cases that it cites are of no use in determining whether a city in a particular state has the authority to create a cause of action or to otherwise affect private law. *See id.* at 696-710 & nn 160, 163.

In *Marsh v. McLaughlin et ux*, 210 Or 84, 309 P2d 188 (1957), the court held that a property owner could not be liable at common law for injuries sustained as a result of the owner's failure to maintain the sidewalk on the owner's property. The court then looked to the Salem city charter to determine whether it imposed liability on property owners for that conduct and concluded that it did not. That the court looked to the charter is telling, because the court treated the issue as one in which the city *could* impose liability on the property owner, which liability would be enforced in a civil action in state circuit court notwithstanding that the injured party could not prevail in such an action at common law. The court had applied the same principle four years earlier in *Olson v. Chuck et al.*, 199 Or 90, 259 P2d 128 (1953), in which it held that an injured pedestrian could recover against a property owner for injuries sustained as a result of the owner's failure to maintain a sidewalk, based on a Portland code provision that imposed that liability on the owner. Hence, *Marsh* and *Olson* establish that Oregon cities can enlarge the common-law duties and liabilities of private parties.[14]

The dissent does not attempt to explain why Oregon's rejection of one half of McQuillin's general rule

---

[14] *See also Lange v. Minton*, 303 Or 484, 738 P2d 576 (1987); *Harris v. Sanders*, 142 Or App 126, 919 P2d 512, *rev den* 324 Or 322 (1996); note 16 below. In the dissent's view, *Marsh* and *Olson* stand for the proposition that cities have authority to enact ordinances that establish negligence *per se* and that thereby affect the standard of care that is applied by courts within an existing common-law cause of action. In a normal negligence action, a jury or court, as factfinder, determines whether the defendant's conduct was negligent. In other words, it determines where on the continuum of conduct the point is reached that constitutes negligent conduct. A statute or ordinance that is treated by a court as establishing negligence *per se* operates to fix as a legal matter the point on the same continuum where negligent conduct is reached, thereby removing that factual issue from the factfinder. Such a statute or ordinance would not change common-law duties or liabilities; it would simply remove a factual issue from the factfinder about whether or not the particular conduct met the recognized duty to act reasonably. *Marsh* and *Olson* involve ordinances that have a very different effect. Under the common law, a landowner could *not* be liable for failing to maintain a sidewalk to guard against the hazards presented in those cases. As a matter of law, there was *no* duty to maintain the sidewalk to remove the hazards and *no* liability could attach for failing to perform that duty. Consequently, there was no continuum of conduct for a factfinder to consider to determine whether or not the particular conduct fulfilled the recognized duty to act. *Marsh* and *Olson* established the principle that municipal ordinances *could* impose a duty on landowners to maintain sidewalks and that breach of that duty *could* result in liability in a state court action to those harmed by the breach. That is precisely what McQuillin says municipal ordinances cannot do.

should cause us to treat the other half of it as nevertheless valid in Oregon. In fact, both halves of the rule are based on a widely held assumption that cities lack authority to affect private law. That assumption does not withstand examination, as Professor Schwartz demonstrated in his comprehensive 1973 article on the authority of home rule cities to affect private law.[15] Most critically, however, the Supreme Court's implicit rejection of that assumption through its decisions in *Marsh* and *Olson* means that McQuillin's statement loses all force as support for the dissent's distinction between the authority of cities to create new causes of action and their authority to alter liability under existing ones. *See* 165 Or App at 214-20.[16]

---

[15] *See* Gary T. Schwartz, *The Logic of Home Rule and the Private Law Exception*, 20 UCLA L Rev 671, 672-777 (1973).

[16] The dissent treats McQuillin's rule as if it were based on the principle that cities lack authority to impose obligations on state agencies and officials, rather than on the principle that cities lack authority to affect private law. As explained above, McQuillin's rule is based on the latter principle, not the former. *See* Schwartz, 20 UCLA L Rev at 696-710 & nn 160, 163. There is no doubt that Oregon cities lack authority to impose obligations on the state, but that does not mean, as the dissent would have it, that the Oregon cases that have applied that principle support the application of the McQuillin rule in Oregon. For example, the dissent claims that the McQuillin rule against creating causes of action or affecting common-law liability "finds expression in *La Grande v. Municipal Court.*" 165 Or App at 217. However, *La Grande* had nothing to do with creating or affecting private remedies that could be litigated in state court. It dealt with the authority of a city to add to the jurisdiction of the local state circuit court by making it the appellate court for the city's municipal court. Giving people a cause of action that they can litigate in court does not add to the jurisdiction or authority of the state courts or impose obligations on them that they do not already have.

Furthermore, the distinction that the dissent draws between municipal authority to affect existing causes of action and its authority to create new ones makes no sense. In the dissent's view, a city can enact an ordinance that affects a negligence claim but not one that creates a claim for employment discrimination. However, negligence is simply the label that we attach to the circumstances in which you can be liable for harm caused by your inadvertent conduct. Wrongful discharge, battery, intentional infliction of emotional distress, and similar terms are simply the labels that we attach to the circumstances in which you can be liable for your intentional conduct. If the common law establishes that you are *not* liable for harm caused by your inattention to the condition of your sidewalk, but a municipal ordinance makes you liable for that harm, then the ordinance has imposed liability for conduct that the courts would not recognize as tortious and, hence, actionable. *See Marsh*, 210 Or at 88-91; *Olson*, 199 Or at 105-13; *Harris v. Sanders*, 142 Or App 126, 919 P2d 512, *rev den* 324 Or 322 (1996). Similarly, if the common law would not impose liability for the harm caused by your decision to discharge an employee on the basis of sexual orientation, but a municipal ordinance makes you liable for that harm, then that ordinance, too, imposes liability for conduct that the courts would not recognize as tortious or actionable. The two ordinances are functionally indistinguishable for these purposes, yet the dissent concludes that a city has authority to enact one but not the other.

■■    Defendant's final contention is that Portland's crea-
tion of a private cause of action conflicts with state statutes
that give the Multnomah County Circuit Court jurisdiction
over, and the Portland city attorney authority to bring, pro-
ceedings to prosecute violations of Portland's ordinances.[17]
Defendant reasons that those statutes represent the sole
source of authority for Portland to enforce its ordinances in
state court. Consequently, Portland exceeded that authority
by creating a private cause of action that litigants could pur-
sue in state court for violations of the anti-discrimination
ordinance. Two federal judges have used similar reasoning to
dismiss claims brought in federal court under the Portland
ordinance.[18] Defendant misconceives the role of the relevant
statutes.

■■ ■■    The courts of one sovereign generally do not execute
the penal laws of another.[19] That means that governmental
officials who prosecute offenses must do so in the courts of the

---

[17] The statute that gives the Multnomah County Circuit Court jurisdiction
over such proceedings is ORS 3.136(1). It provides:

"The circuit court for a county within the boundaries of which there is sit-
uated the largest part of a city having a population of more than 300,000 shall
have all judicial jurisdiction, authority, powers, functions and duties of the
municipal court of each such city and the judges thereof with respect to all vio-
lations of the charter and ordinances of each such city."

At the time that this case began, that statute gave the Multnomah County District
Court rather than the circuit court that jurisdiction. The abolition of the district
court on January 15, 1998, caused the jurisdiction to shift from the district court to
the circuit court. *See* notes preceding ORS 1.001. The statute that addresses the
authority of city attorneys to prosecute municipal violations is ORS 221.315(1),
which provides, as relevant:

"Prosecution of violations of the charter or ordinances of a city in circuit
court or justice court shall be by the city attorney in the name of such city. An
agreement may be made between any city and, on behalf of the state, the pre-
siding judge for the judicial district in which all or part of such city is located,
that such violations be prosecuted for such city in the circuit court by the dis-
trict attorney in the name of the State of Oregon."

To the extent that ORS 3.136 is understood to make the Multnomah County Circuit
Court the *municipal court* for Portland for the prosecution of Portland municipal
violations, ORS 221.315(1) may not have any bearing on such prosecutions,
because the latter statute applies only to the prosecution of municipal offenses in
*circuit court*. We need not resolve that issue to decide this case.

[18] *See Brown v. Starbucks Corp.*, No. 96-269-MA (D Or 1996); *Sexsmith v.
Marriott International, Inc.*, 896 F Supp 1040, 1041 (D Or 1995); *Seidel v.
Albertson's, Inc.*, No. 94-1275-FR, 1995 WL 82268 (D Or 22, 1995).

[19] *See generally Huntington v. Attrill*, 146 US 657, 666-69, 13 S Ct 224, 36 L Ed
1123 (1892); *Restatement (Second) of Conflict of Laws* § 89 (1971); Robert A. Leflar
et al., *American Conflicts Law* §§ 46, 111 (4th ed 1986).

sovereign that they serve. We do not need to decide the extent to which that principle applies to the state and municipal governments in Oregon. It is sufficient to recognize that it could operate to deny Oregon municipalities the ability to use the state circuit court as the forum for municipal officials to prosecute municipal offenses.

We believe that the legislature recognized that principle when it enacted the statutes that permit Portland to use the Multnomah County Circuit Court to prosecute municipal violations.[20] Whether those statutes expanded circuit court jurisdiction to encompass those proceedings or simply served to confirm its jurisdiction over them, the legislature's decision to enact those statutes does not imply a decision *to subtract* from the court's existing jurisdiction over private-law disputes, which, as we have explained above, includes jurisdiction over disputes that are based on municipal law. Hence, Portland's decision to create a private cause of action for violations of its anti-discrimination ordinance does not conflict with the statutes that permit Portland to use the circuit court to prosecute municipal violations, that is, to use it for public law enforcement.[21]

In summary, Portland did not exceed its authority by prohibiting discrimination by Portland employers on the basis of sexual orientation and by giving people who are harmed by the prohibited conduct a claim for relief for that harm in any court that has jurisdiction to hear such a claim. State circuit courts are courts that have jurisdiction to hear such a claim. The trial court erred in concluding that they do not.

Plaintiff's third claim for relief sought to recover damages for defendant's alleged violation of Portland's anti-discrimination ordinance on the ground that the violation constituted a "statutory tort." The city also sought a declaration that its ordinance could provide the basis for such a claim. On appeal, plaintiff and the city also argue that the

---

[20] ORS 3.132, ORS 221.315(1), and ORS 221.337, in turn, permit other Oregon cities to use the circuit court for the same purpose.

[21] The foregoing discussion refutes the dissent's contention, 165 Or App at 210 n 4, that our decision renders superfluous the statutes that give circuit courts jurisdiction over proceedings to prosecute municipal violations.

claim could be understood to allege a claim for wrongful discharge. We understand plaintiff and the city to assert the claim as an alternative claim that could be pursued if it were determined that the city lacked authority to create a cause of action for violation of the ordinance. Because we have concluded that the city had authority to create a cause of action that could be litigated in state court, we do not reach plaintiff's and the city's alternative claim.

Reversed and remanded to reinstate plaintiff's second claim for relief and to declare that PCC § 23.01.080E is valid as against the objections raised by defendant and that plaintiff can pursue a claim under PCC § 23.01.080E against defendant in circuit court; otherwise affirmed.

**LINDER, J.,** concurring.

I write separately because, although I agree with the lead opinion's ultimate validation of the city's ordinance, its analysis sweeps too broadly in concluding generally that "cities can enlarge the common-law duties and liabilities of private parties." 165 Or App at 193. As I understand the lead opinion, a city's authority to alter private rights and responsibilities is unlimited except insofar as the legislature affirmatively has enacted preemptive state laws. In my view, the issue need not and should not be decided in terms so general or so abstract. The precise question before us is whether *this* ordinance is within the city's power to enact. Pursuant to a more narrow—or at least more specific—analysis, I would conclude that it is.

The starting point is to examine the challenged ordinance and the city's interest in it. To be sure, no one disputes that the general nondiscrimination policy embodied in the ordinance is one that the city may pursue. Indeed, defendants carefully "reiterate" in their brief that they do not assert that the city acted outside its authority in enacting a nondiscrimination policy; their objection is to the creation of a private cause of action to further that policy. But the issue cannot be analyzed in a contextual vacuum. The ordinance's provisions and the purposes underlying them are the predicate for a meaningful examination of the city's authority.

The particular provisions challenged in this case were enacted in 1991 as part of an comprehensive set of ordinances directed to combating discrimination in employment, housing, and public accommodation. By design, the provisions parallel and complement the nondiscrimination provisions of ORS chapter 659. For example, prohibited employment acts are those made unlawful under ORS 659.030 and ORS 659.425; prohibited acts in selling, renting, or leasing real property are those made unlawful under ORS 659.033 and ORS 659.430; and prohibited acts in places of public accommodation include those made unlawful under ORS 659.037 and ORS 659.425. *See* Portland City Code (PCC) 23.01.050 to 23.01.070. The city's code explicitly provides for enforcement of the nondiscrimination provisions through the complaint procedures established in ORS chapter 659 and administered by the Commissioner of the Bureau of Labor and Industries.[1] *See* PCC 23.01.080. Of particular significance here, the ordinance further provides: "Any person claiming to be aggrieved by an unlawful discriminatory act under the provisions of this code shall have a cause of action in any court of competent jurisdiction for damages and such other remedies as may be appropriate." PCC 23.01.080(E).

The essential difference between the city's ordinances and state law lies in the fact that the ordinances' prohibitions extend expressly to discrimination on grounds that include sexual orientation and source of income.[2] *See generally* Title 23, chapter 1 of the PCC. The Portland City Council included those categories of discrimination after months of research, background work by city staff and community leaders, and extensive public hearings examining discrimination on those grounds in employment, housing, and public accommodations. The public hearings culminated in the council's finding that such discrimination exists and is detrimental to

---

[1] The city has not purported to force this role on the Commissioner or the agency. Rather, apparently through some form of intergovernmental agreement (*see* ORS 190.010), the Commissioner and the city have agreed to this cooperative mechanism of enforcement.

[2] The city's code also establishes uniform protection for all prohibited grounds of discrimination. Under ORS chapter 659, some categories of discrimination (*e.g.*, age and familial status) are protected for some purposes and not others.

the city's general welfare and the full participation of its citizens in city life. The council's finding, which it codified, is worth quoting in full:

> "The City Council finds that discrimination on the basis of sexual orientation and source of income exists in the City of Portland and that state law does not clearly prohibit such discrimination. It is the intent of the Council, in the exercise of its powers for the protection of the public health, safety, and general welfare and for the maintenance of peace and good government, that every individual shall have an equal opportunity to participate fully in the life of the City and that discriminatory barriers to equal participation in employment, housing, and public accommodation be removed."

PCC 23.01.020. *See also* PCC 23.01.010 (recognizing that all prohibited discrimination threatens the "health, safety and general welfare of the citizens of Portland and menaces the institutions and foundation of our community").

The city's nondiscrimination provisions are far from novel, at least in their fundamental terms. They reflect a now-familiar and commonplace policy of equal access and nondiscrimination in areas basic to the most minimal quality of life in our communities: employment, housing, and public accommodation. In that regard, it is not surprising that defendants do not dispute the legitimacy of the city's regulatory goal or the city's general authority to legislate to that end. The days of doubting that so-called "civil rights laws" reflect compelling public interests are long past. Nor is there doubt that those policies are of equal or greater concern to municipalities than they may be to states or to the nation as a whole. *See, e.g., District of Columbia v. John R. Thompson Co.*, 346 US 100, 73 S Ct 1007, 97 L Ed 1480 (1953) (upholding District of Columbia ordinance prohibiting restaurants from discriminating based on race as valid exercise of police power and within district's authority as a municipality exercising home rule). As the Kansas Supreme Court pointedly observed:

> "We would be hard pressed to say at this point in time and history that legislation designed to eliminate the poison of discrimination from our midst is not a proper exercise

of the police power. Recent experience has gone far to demonstrate, particularly in urban communities, that discrimination against minorities has a direct and detrimental impact on the orderly processes of government, the peace and tranquility of a community, and the health, safety and general well-being of its residents.

"Problems arising from racial and other forms of discrimination are especially common in population centers; the cancer of injustice toward members of minority groups is peculiarly virulent on the local scene; discrimination is essentially a people problem, and must eventually be dealt with and solved by people in the localities where they live."

*Hutchinson Hum. Rel. Com'n v. Midland Cr. Man., Inc.*, 213 Kan 308, 312, 517 P2d 158, 162 (1973). *See also City of Atlanta v. McKinney*, 265 Ga 161, 454 SE2d 517 (1995) (upholding ordinance prohibiting discrimination based on sexual orientation as a proper exercise of municipality's police power).[3]

The dispute, correctly, is not whether nondiscrimination policies are important to the general welfare—they plainly are. Nor is the dispute whether such policy objectives are of compelling interest and importance at municipal levels—they plainly are that too. The *only* objection is to the remedy devised—that of a private cause of action for damages. The issue, then, is not whether municipalities have general authority to adjust rights and responsibilities as between private citizens. The precise issue is whether a city may do so to further substantive policies that a municipality is otherwise fully entitled to advance.

So framed, then, the question must be: what is the source of a limitation on the city's authority in that regard? Municipalities do not have plenary legislative authority, and they therefore "cannot enact charters or legislation of any

---

[3] Indeed, municipalities tend to be the proving grounds—in terms of both need and public acceptance—for nondiscrimination policies that later are adopted at state and national levels. Public accommodations ordinances requiring equal access for racial minorities, for example, were enacted at local and state levels before federal legislation came into existence. *Compare John R.Thompson Co.*, 346 US 100 (1872 and 1873 ordinances) *with* The Civil Rights Act of 1964, 42 USC § 2000a *et seq.* The same is true of fair housing laws. *Compare Chicago Real Estate Board v. City of Chicago*, 36 Ill 2d 530, 224 NE2d 793 (1967) *with* the Fair Housing Act of 1968, 42 USC § 3601 *et seq.* (1970).

kind merely because it is not expressly forbidden." *La Grande v. Municipal Court et al.*, 120 Or 109, 114, 251 P 308 (1926). Rather, they are limited to enacting laws directed to their local interests and exercising "those powers incident and germane to the municipal government." *State ex rel. v. Port of Tillamook*, 62 Or 332, 341, 124 P 637 (1912). Thus, it is well-settled that municipalities cannot exercise authority extramurally—that is, by extending their governmental reach beyond their jurisdictional boundaries. *See id.* at 342 (port could not annex territory outside port district without consent of residents of land to be annexed). Nor may they exercise control over other government officials or agencies. As we recently observed:

> "Although the perimeters of city and county home rule authority may defy easy delineation, certain qualifications of that authority may be stated with some confidence. In particular, it is well established that, whatever else local government authority may entail, it does not include governing the conduct of state and federal officials."

*State v. Logsdon*, 165 Or App 28, 32, 995 P2d 1178 (2000) (citations omitted).

On the other hand, municipalities are not deprived of authority to legislate in a particular area merely because their interest is not exclusively or uniquely local. As the Supreme Court explained in *LaGrande/Astoria v. PERB*, 281 Or 137, 148-49, 576 P2d 1204, *on reh'g* 284 Or 173, 176, 586 P2d 765 (1978), municipalities and the state legislature in many instances pursue substantive objectives on the same subject matter that are well within the respective authority of both levels of government. Their legislative interests may—and frequently will—overlap. In that circumstance, the inquiry is whether both policies may coexist, or whether one must give way, and, if so, which one. *Id.*

If municipalities lack authority to create private causes of action for damages or other remedies, then it must be because such causes of action either do not reflect a municipal interest or conflict with a desirable policy of statewide

uniformity. Local legislation attempting to adopt, for example, unique policies of property, contract, or domestic relations law might invite problems at the state level by purporting to determine rights for persons who do not reside locally or who do not remain there. Courts in other jurisdictions have resisted the notion that municipalities should be able to have separate substantive law in such areas for essentially that reason. *See, e.g., City of Bloomington v. Chuckney*, 165 Ind App 177, 331 NE2d 780, 783 (1975) ("a city should not be able to enact its own separate law of contracts or domestic relations since these areas are unsuited to less than state-wide legislation"); *see also McKinney*, 265 Ga at 164, 454 SE2d at 520 (similar observation made in context of state constitutional provision expressly forbidding municipalities from enacting special laws relating to rights or status of private persons).

But the issue here is not whether municipalities can adjust private rights and liabilities generally or with regard to private contracts, property rights, or other substantive areas that may reach beyond local boundaries. The narrow question is whether municipal legislative authority extends to creating a private cause of action as a remedy for discrimination prohibited by ordinance. On that precise issue, courts in other jurisdictions appear divided. A few have endorsed McQuillin's view[4] and have invalidated a damages remedy authorized by local ordinance. *See, e.g., Yellow Freight Systems v. Mayor's Com'n*, 791 SW2d 382 (Mo 1990); *Marshall v. Kansas City*, 355 SW2d 877 (Mo 1962) (*dictum*). Other authorities point in the opposite direction. *See, e.g., Trans World Airlines v. City of Philadelphia*, 44 PaCmwlth 341, 403 A2d 1057 (1979) (sustaining compensatory damage award related to employer's discrimination against pregnancy-related disability in violation of local ordinance); *Hutchinson Hum. Rel. Com'n*, 213 Kan at 316-17, 517 P2d at 165 (invalidating damage award only because not provided for by ordinance; no suggestion that damage award could not have been authorized by ordinance). At least one jurisdiction has concluded that, in the absence of a preemptive state provision,

---

[1] I refer here to the "general rule" offered in Eugene McQuillin, 6 *The Law of Municipal Corporations* § 22.01, 388 (3d ed 1998) quoted in the lead opinion. 165 Or App at 192.

creation of a private action for damages is well within municipal authority to further nondiscrimination policies. *See, e.g., Bracker v. Cohen,* 204 AD2d 115, 612 NYS2d 113 (1994) (upholding compensatory and punitive damage award).

We can resort, however, to Oregon precedent for more guidance. As the majority observes, prior Oregon cases have approved of damage actions when those actions were provided for only by local ordinance and not by common law or any other legal source. If I find fault with the lead opinion on that score, then it is because it too quickly glosses over that line of cases in favor of a broader principle that the cases do not support (*i.e.*, that municipalities have general authority to enlarge private rights and obligations).

Both *Marsh v. McLaughlin et ux,* 210 Or 84, 309 P2d 188 (1957), and *Olson v. Chuck et al.,* 199 Or 90, 259 P2d 128 (1953), involved local ordinances that required landowners to repair sidewalks abutting their property. In both cases, pedestrians were injured by hazards in sidewalks and sued the abutting landowners for damages. In both cases, the defendants demurred to the complaints. In *Olson,* the court concluded that plaintiff had a cause of action. In *Marsh,* the court reached the opposite conclusion.

The court in *Marsh* distinguished *Olson* and observed that, because a landowner had no common-law duty to repair the area in front of his property, the court had to "look to some legislative enactment of the state *or city* as the basis for liability." 210 Or at 89, 91-92 (emphasis added). There was no state law creating liability. In *Olson,* private liability had been created expressly by the City of Salem's ordinance, so the pedestrian in *Olson* had a cause of action against the landowner. In contrast, in *Marsh,* the City of Portland had imposed a duty of maintenance on the landowner but had not provided for a cause of action for an injured pedestrian. Consequently, the pedestrian's private action in *Marsh* failed. *Id.* at 91-92.

*Marsh* and *Olson* were not negligence or negligence *per se* actions in which the court, in adjudicating a common-law action, looked to municipal legislation to define the scope of the private citizen's common-law duty of care. They rested

squarely and only on the premise that the injured pedestrians had a cause of action against the abutting landowners only if that cause of action was created by express municipal declaration. The cases are of limited precedential force in this context because neither involved a direct challenge to a municipality's authority to include such a provision in its sidewalk ordinance. But they nevertheless are of value, for three reasons. First, they demonstrate that, in Oregon, ordinances creating private causes of action are not novel or unprecedented. Second, although neither *Marsh* nor *Olson* directly examined municipal authority to create the causes of action at issue in those cases, both cases at least implicitly accept that there is such authority. Third, given their divergent outcomes, *Marsh* and *Olson* tacitly acknowledge that statewide uniformity of private rights and liabilities is not, at least in all contexts, an overriding goal or principle.

Although the lead opinion does not discuss it, there is at least one prior Oregon case in which a city's creation of otherwise nonexistent private liability was directly challenged as beyond its municipal authority. The challenge failed. In *Covey Garage v. Portland*, 157 Or 117, 70 P2d 566 (1937), the city passed an ordinance regulating car rentals. The ordinance required the businesses to be licensed by the city; to post a surety bond or liability insurance policy of $1,000; and to agree that the bond or insurance would indemnify persons injured by the negligence of anyone renting cars from the licensed rental agent. *Id.* at 120-21. Further and significantly, the ordinance provided that anyone injured, or the heirs of anyone killed, by a driver's negligence would be authorized to bring an action against the licensee, the surety, or the insurer for damages.[5] The plaintiff, a rental and repair business, brought an action seeking to invalidate the ordinance on the grounds that vehicle regulation was preempted by state law and that the ordinance's provisions were otherwise beyond the city's regulatory power.

---

[5] Specifically, the ordinance permitted the injured person (or heirs of the deceased) to bring the action "on his own relation in the name of the city." *Covey Garage*, 157 Or at 121. The fact that the action was nominally in the city's name, but with the injured person as the party benefitted by the action, played no part in the court's analysis of municipal authority.

The court held that the city's ordinance was not preempted by state law because it was a complementary enactment that sought to achieve the same goals by "different methods." *Id.* at 125. With regard to the plaintiff's challenge to the liability provisions, the court observed that the purpose of creating liability was "to coerce [the renter] into renting his cars only to those who will drive with care." *Id.* at 128. The court considered it "a matter of common knowledge that a consciousness of financial responsibility for negligence tends to promote care, and, conversely, that a consciousness of financial irresponsibility tends to promote indifference." *Id.* at 130 (quoting with approval *Hodge Drive-It-Yourself Company v. Cincinnati*, 123 Ohio St 284, 175 NE 196, 199 (1931), *aff'd* 284 US 335, 52 S Ct 144, 76 L Ed 323 (1932)). After detailing the city's general welfare interests in regulating to avoid irresponsible drivers, the court upheld the ordinance's liability provisions as a reasonable exercise of the city's police power, one that the city could impose on licensees even though at common law they had no liability for the negligence of their bailees (*i.e.*, renters). *Covey Garage*, 157 Or at 140-41.

The analysis that the court followed in *Covey Garage* is the analysis that should be followed here: the first step is to assess the legitimacy of the municipality's regulatory goal; if it is legitimate, then the next question is whether the means chosen to serve the interest reasonably does so; finally, the local legislation must not conflict with preemptive state policy. In this case, the city's nondiscrimination ordinance readily satisfies each of those inquiries. The substantive policy of eliminating discrimination in housing, employment, and public accommodations reflects concededly valid—and, indeed, compelling—municipal concerns. In providing a private right of action to redress damages caused by prohibited discrimination, the ordinance undeniably furthers its objectives and does so effectively. As the court observed in *Covey Garage*, financial liability is one of the most effective tools to achieve compliance with social obligations.

The city's ordinance can be invalid, then, only if the creation of a private right of action conflicts with state regulatory policy in the same substantive area. Plainly, it does not, and defendants do not argue otherwise. As was true in

*Covey Garage,* and as is often true of municipal and state legislation, the substantive goals of the nondiscrimination policies embodied in ORS chapter 659 and in the city's ordinances are the same. The fact that the city's ordinances extend broader protection than state law is not objectionable, given the protective purpose of the policy. *See State ex rel Haley v. City of Troutdale,* 281 Or 203, 576 P2d 1238 (1978).[6]

In sum, I depart from the lead opinion's holding that cities have general or abstract authority to enlarge the common-law duties and liabilities of private persons. But I agree that, in creating a private cause of action as part of its non-discrimination policy, the City of Portland has acted within its municipal authority in this instance. In all other respects, I agree with the lead opinion's essential analysis of the other issues that this case presents.

Deits, C. J., and Haselton and Kistler, JJ., join in this concurrence.

**EDMONDS, J.,** dissenting.

This case presents the issue of whether a municipality lawfully can require by ordinance that a state court provide a forum for a civil law suit for compensatory damages brought by a private citizen based on the violation of a city ordinance. The lead opinion answers that question in the affirmative. I disagree because the lead opinion's conclusion violates the concept of the state's sovereignty over its political subdivisions and improperly enlarges a city's authority.

A general introduction to the issue and the arguments surrounding it is helpful to an understanding of the specific arguments that bear on the core of the issue. The city has adopted Portland City Code (PCC) 23.01.050B, which

---

[6] Indeed, with respect to discrimination based on sexual orientation, ORS 659.165 prohibits ordinances that "single out" those individuals *for* discriminatory treatment, or that provide preferential treatment for that group. *See deParrie v. City of Portland,* 138 Or App 105, 906 P2d 844 (1995), *rev den* 323 Or 114 (1996) (examining meaning of statute). Implicit in that prohibition is a recognition that local governments in Oregon properly may enact nondiscrimination policies of their own.

prohibits discrimination in employment based on sexual orientation, and PCC 23.01.070B, which prohibits discrimination in places of public accommodation based on an individual's sexual orientation. In its brief on appeal, the city describes the sources of its authority to promulgate those ordinances and argues:

> "Portland's first legislative charter became effective January 23, 1851, upon passage of the Council of the Legislative Assembly of the Territory of Oregon, Special Laws of Oregon 1850-51, §§1-28, pp 16-22. In 1903, the Legislative Assembly passed a special act that granted a charter to the City of Portland, Special Laws of Oregon 1903, Chapter I. Chapter II, Article IV, section 73(1), of the City's 1903 Charter granted the Portland City Council the power: *'To exercise within the limits of the City of Portland all the powers commonly known as the police power, to the same extent as the State of Oregon has or could exercise said power within said limits.'* * * * Section 73(2) of that same chapter further grants the City the power: 'To make and enforce within the city all necessary water, local, police, and sanitary laws and regulations.'
>
> "Although various changes were made to Portland's charter by the legislature or the people over the years, none affected this expansive grant of power to the City. The City's current charter continues to grant it the power to exercise *all* of the powers of the state, as well as the power to 'secure the protection of persons and property and to provide for the health, cleanliness, ornament, peace, safety and good order of the City.' Charter, Sections 2-105(a)1 and 2."

(Emphasis added in the city's brief.)

Article XI, section 2, of the Oregon Constitution, provides that "[t]he legal voters of every city and town are hereby granted power to enact and amend their municipal charter, *subject to the Constitution*[.]" (Emphasis added.) I do not question the city's authority to enact PCC 23.01.050B and PCC 23.01.070B under the police power granted to it by Article XI, section 2, of the Oregon Constitution, and its charter. However, the city asserts that its charter empowers it to direct state courts to provide a forum for the violations of its ordinances and that PCC 23.01.080E, the ordinance at issue in this case, is a lawful exercise of that authority.

PCC 23.01.080 provides, in part:

"E.    Any person claiming to be aggrieved by an unlawful discriminatory act under the provisions of this code shall have a cause of action in any court of competent jurisdiction for damages and such other remedies as may be appropriate. Election of remedies and other procedural issues relating to the interplay between administrative proceedings and private rights of action shall be handled as provided for in ORS 659.095 and 659.121. The court may grant such relief as it deems appropriate, including, but not limited to, such relief as is provided in ORS 659.121."

PCC 23.01.080E differs from PCC 23.01.050B and PCC 23.01.070B. The latter impose obligations on Portland citizens. Arising out of those obligations are rights held by others, including employees, under the ordinances. The former provides a remedy for the violation of those rights. By its enactment of PCC 23.01.080E, the city seeks to establish within courts of competent jurisdiction a cause of action for the vindication of those rights by its offended citizens. In this case, the "court of competent jurisdiction" is the circuit court, according to plaintiff and the city.

To the extent that the city seeks to direct by ordinance that the circuit court of the State of Oregon is a court of competent jurisdiction for the adjudication between private parties of a violation of the city's ordinances, its exercise of the police power granted to it by the constitution and its charter is *ultra vires*.[1] Only the people of the State of Oregon, by the initiative process or through their elected representatives, the legislature, can exercise that authority under the constitution. The constitution represents a grant of authority to state government by the people of the State of Oregon whereby they consent to be governed with respect to the subjects enumerated therein. Municipal corporations such as cities can exercise no more authority than what is granted to them by the constitution. As political subdivisions created under the constitution, their authority is inferior to that exercised by the legislature, unless the constitution expressly

---

[1] *Ultra vires* means "[a]n act performed without any authority to act on [the] subject" and an "[u]ltra vires act of [a] municipality is one which is beyond [the] powers conferred upon it by law." *Black's Law Dictionary*, 1522 (6th ed 1990).

provides to the contrary. As the city must acknowledge, its police power under its charter is expressly limited to its territorial limits. Consequently, the authority to provide remedies through court proceedings is similarly limited.

In the absence of any authority from its charter, the city is dependent on the legislature for authority to enact ordinances like PCC 23.01.080E. ORS 221.315, ORS 221.337, ORS 3.132 and ORS 3.134 permit cities to utilize state courts and are examples of the legislature's exercise of the authority that was granted to it by the constitution. ORS 221.315 permits a city attorney in the name of the city to prosecute violations of the city's charter or ordinances. ORS 3.132 (*formerly* ORS 46.040) provides that circuit and municipal courts have concurrent jurisdiction of all violations of municipal charters or ordinances. ORS 3.134 (*formerly* ORS 46.047) provides that, when an offense defined by municipal ordinance is tried in a circuit court, it is subject to the statutes and rules that govern the trial of similar offenses under state statute. When read together, those statutes permit a city to prosecute violations in a state court. However, those statutes do not authorize a private citizen to bring a civil claim for damages in circuit court based on the violation of the city's anti-discrimination ordinances. In sum, the city is unable to point to any express provision of the Oregon Constitution or of the Oregon Revised Statutes that authorizes it to direct the circuit court to provide private parties a forum for the violation of its anti-discrimination ordinances.

The lead opinion takes a different tack from that argued by plaintiff and the city to avoid the dilemma of the city's *ultra vires* enactment. It relies on Article VII (original), section 9, of the Oregon Constitution. Section 9 provides, in part:

> "All judicial power, authority, and jurisdiction not vested by this Constitution, or by laws consistent therewith, exclusively in some other Court shall belong to the Circuit Courts * * *."

To the extent that the lead opinion argues that section 9 supports the city's and plaintiff's reasoning, there is not one word in section 9 about any grant of authority to municipalities. A municipality's power to provide a forum for the enforcement

of the laws that it creates can be no greater than the power granted to it by the source of its authority, or in this case, the constitution.[2] It is clear that the authority of the city to direct that the circuit court provide a remedy[3] for the violation of its ordinances cannot be found in any express grant of authority in the constitution to the city and that such authority does not exist.

Nonetheless, the lead opinion reasons that, because circuit courts of the State of Oregon are courts of general jurisdiction and the city has assigned by its ordinance a function to the circuit court that is within the court's jurisdiction, it follows that the city is authorized to direct the state circuit courts to provide private parties a forum for the violations of the city's ordinances. The lead opinion perceives the circuit court conceptually as a global reservoir for all claims brought by the citizens of Oregon, regardless of the source of law for those claims.[4] Thus, it concludes that, regardless of the city's authority, the *court's* authority is not enlarged by the city's

---

[2] For example, at issue in *State v. Logsdon*, 165 Or App 28, 30, 995 P2d 1178 (2000), was whether a provision in a county charter, "which forbids police to search private property without prior written consent or a search warrant," was invalid. In holding that the provision was invalid, we reasoned:

"In particular, it is well established that, whatever else local government authority may entail, it does not include governing the conduct of state and federal officials. *See, e.g., Multnomah County v. $5,650 in U.S. Currency*, 309 Or 285, 289, 786 P2d 729 (1990) ('The fact that a county acts under a home rule charter does not mean that it can call upon the state courts to enforce ordinances or otherwise to exercise their jurisdiction in any case that the county wishes.'); *La Grande v. Municipal Court et al.*, 120 Or 109, 114-15, 251 P 308 (1926) (cities cannot alter jurisdiction or function of state courts); *Kiernan v. Portland*, 57 Or 454, 463, 111 P 379 (1910), *error dismissed* 223 US 151, 32 S Ct 231, 56 L Ed 386 (1912) (home rule entities may not regulate other governmental units); *Lines v. City of Milwaukie*, 15 Or App 280, 286, 515 P2d 938 (1973), *rev den* (1974) (home rule city does not have authority to alter the jurisdiction of state courts)."

*Logsdon*, 165 Or App at 32-33.

[3] A "remedy" is defined, in part, as "[t]he means by which * * * the violation of a right is * * * redressed[.]" *Black's* at 1294. A remedy includes an action for damages in a particular forum.

[4] If the lead opinion is correct, then statutes like ORS 221.315, ORS 221.337, ORS 3.132 and ORS 3.134 that permit cities to utilize state courts to enforce their criminal and quasi-criminal ordinances are meaningless; the general jurisdiction of the circuit court would permit municipalities to enforce ordinances in circuit court as well as permit claims between private citizens. Although the lead opinion's reasoning is premised on a distinction between such claims and private claims, it never identifies the origin of the distinction in terms of grants of authority.

ordinance directing that the court provide a forum for the violation of the city's anti-discrimination ordinances. In general, the lead opinion's reasoning has several fatal flaws.

First, the lead opinion's reasoning is *non sequitur*. The constitutional grant of authority to a municipality to make law and impose duties on its citizens is fundamentally different from and does not overlap with the constitutional grant of authority to state circuit courts to adjudicate civil claims. Under the constitution, the lawmaking function and the judicial function are vested in different branches of government. Moreover, the constitutional grant of lawmaking authority to the city is not only discrete from the grant of judicial authority to state courts but is vested in a political subdivision that is subordinate to the authority granted to the legislature. Under the lead opinion's views, any political subdivision of the state could contribute, through its ordinances, to state jurisprudence and, regardless of the will of the legislature or the people, compel enforcement of its legislation by appropriating state courts, the judicial arm of the state, to its own use. The lead opinion's reasoning, when taken at face value, violates principles of state sovereignty over its political subdivisions.

Second, the lead opinion's reasoning improperly conflates what are discrete concepts that circumscribe the authority of municipalities and of the circuit courts. Just as a municipality has only the constitutional police power to impose obligations on its own citizens and to declare rights only on behalf of those injured by the violations of its ordinances, so too is its authority circumscribed regarding the forums that it can provide to adjudicate the remedies it has enacted. What governs the subject matter jurisdiction of courts differs from what legal rules provide the extent of a city's authority. The circuit courts operate under a constitutional grant of authority that is discrete from the constitutional grant of authority to municipalities. As courts of general jurisdiction under section 9, circuit courts are empowered to exercise jurisdiction over matters of discrimination. However, it does not also follow from that grant of general jurisdiction that they are required to recognize any legal rule governing discrimination, regardless of its source.

The lead opinion's reasoning requires circuit courts to recognize the legislative enactments of municipalities as binding upon them merely because circuit courts are courts of general jurisdiction. That reasoning is erroneous because, even though a court has subject matter jurisdiction, a court exercises its authority erroneously if it gives effect to a rule of law that is *ultra vires*, that is, a rule of law that exceeds the authority of the promulgating body. When a court applies an *ultra vires* rule, it improperly enlarges the authority of the promulgating body. In light of the foregoing general discussion, I turn to the specific claims made by plaintiff and the lead opinion's reasoning regarding those claims.

Plaintiff's first claim in his amended complaint alleges a violation of ORS 659.030. He stipulated to its dismissal in the trial court. After this case was briefed on appeal, we decided *Tanner v. OHSU*, 157 Or App 502, 971 P2d 435 (1998). Whether or not plaintiff's first claim states facts sufficient to state a cause of action under *Tanner* is not properly before us in light of plaintiff's stipulation. Plaintiff's second claim is labeled as a "[v]iolation of PCC § 23.01.070 *et seq.*" The viability of the claim in circuit court rests on the proposition that the city has the authority to direct the court to provide a forum for the violation of its ordinances. Also, plaintiff alleges a third claim that he has labeled as a statutory tort claim. He alleges, in part:

> "Pursuant to ORS 659.030 and PCC §23.01.070, defendants stood in a special relationship to plaintiff and owed plaintiff the duty to not discriminate against plaintiff based on his sexual orientation and to provide him with a discrimination-free workplace."

I understand plaintiff's and the city's present position to be that ORS 659.030 does not factor into the calculus for determining whether the trial court erred in granting summary judgment on the third claim. Because the complaint appears to allege a common-law claim as well as a claim based on the city's ordinance, it is appropriate to analyze it under both theories.

According to the lead opinion, the judicial power identified in section 9 includes the power to adjudicate private-law disputes without regard to the source of law governing the dispute, and "*Aldrich v. Anchor Coal Co.*, 24 Or 32, 32

P 756 (1893), illustrates the principle." 165 Or App at 187-88. In fact, *Aldrich* stands for a proposition contrary to that stated by the lead opinion. The plaintiffs brought an action in Oregon against a California corporation and one of its stockholders, Loomis, to recover monies on a contract after they had performed work and labor for the corporation. The complaint sought to hold Loomis liable under a California statute that made Loomis personally liable for a portion of the claim. The question posed by the court was "whether an action at law can be maintained in this state to enforce a stockholder's liability created by the laws of California." *Aldrich*, 24 Or at 37.

The court concluded that Loomis's liability under the statute was enforceable in the action brought in Oregon. It explained:

"The statute indeed creates a new right and liability not existing at common law, but *does not prescribe a peculiar remedy for its enforcement*; it only declares that it may be enforced by action, leaving the creditor to select *such common-law remedies* as may be in use in the jurisdiction where the suit is brought to enforce such liability. When a statute not only creates a new right and liability against a stockholder, but prescribes a peculiar remedy for its enforcement, such remedy is sometimes held to be exclusive, and often cannot be enforced *in another state* by the employment of the remedies, and according to the course of procedure, provided by its laws. In such case, it would seem the creditor can enforce the stockholder's liability only in the state where the corporation exists; not, however, because the liability is not recognized as valid and binding, but because the forum where it is sought to be enforced is incapable of administering the peculiar remedy provided for its enforcement. Where a liability, however, is created by statute, without making the procedure for its enforcement, as it were, a part of the liability, we cannot see why it should not be enforced in any court having *jurisdiction of the subject matter* and parties. *There is no difference between a statutory and common-law right or liability in this regard.* The nature of the *remedy* or the *jurisdiction of the court* to enforce it does not in any manner depend on the question whether it is the one or the other. * * * And, in general, a creditor of a corporation whose shareholders are

by a statute made personally liable in the nature of a contract for its debts may maintain a suit or action to enforce this liability in any court capable of administering the proper relief, whenever he can obtain jurisdiction over the parties, if it is not opposed to the legislation or public policy of the state in which it is sought to be enforced."

*Id.* at 38-39 (emphasis added; citations omitted).

Several observations are evident from the court's holding in *Aldrich* that cut against its use as support for the lead opinion's position. *Aldrich* does not involve an attempt by a subordinate political subdivision of the State of Oregon to direct a state court to provide a forum and a remedy. No policy concern regarding interference with Oregon's sovereignty inhibited the recognition of California's statute by the *Aldrich* court. Rather, *Aldrich* presents the issue of whether a California statute will be recognized in Oregon when a common-law remedy is employed. Additionally, the *Aldrich* court clearly distinguishes between the concepts of subject matter jurisdiction and the enlargement of a foreign jurisdiction's authority, a distinction that the lead opinion blurs in its analysis of the issue in this case. As the *Aldrich* court observed, it would have properly declined to provide a remedy for the enforcement of the California statute had the California statute provided for a specific remedy. To have enforced the California statute in Oregon under that circumstance would have resulted in the improper enlargement of the California legislature's authority because it would mean that the California legislature could lawfully direct Oregon courts to provide a forum for its remedy. To permit the City of Portland to direct the circuit court to provide a forum and to supply a remedy for the violation of its ordinances absent a grant of authority from the legislature or the constitution results in a similar usurpation of authority.

The lead opinion recognizes that:

"The dissent is correct that Oregon municipalities infringe on state sovereignty, and thereby act beyond their authority, by requiring or authorizing state officials to perform functions that they have not been authorized by state law to perform."

165 Or App at 189. However, it asserts that "[t]he dissent is wrong, however, in its belief that Portland's creation of the cause of action at issue in this case runs afoul of that principle." *Id.* at 189. According to the lead opinion,

> "the challenged Portland ordinance does *not* add to the circuit court's authority to adjudicate claims. One of the basic functions of the circuit court is to resolve disputes over harm caused to people as a result of failure by others to conform their behavior to the requirements of law. Therefore, independently of the Portland ordinance, the circuit court has authority to adjudicate a claim by an employee of a Portland employer for harm caused by discriminatory treatment by the employer on the basis of sexual orientation."

165 Or App at 190 (emphasis in original).

When the lead opinion claims that PCC 23.01.080E "does *not* add to the circuit court's authority," it fails to perceive the effect of its reasoning. The question is not whether the circuit court's authority has been enlarged by the City's ordinance. Clearly, the circuit court has subject matter jurisdiction over claims based on workplace discrimination. However, subject matter jurisdiction is not equivalent to the authority to appropriate another political entity's courts and require those courts to provide a forum and a remedy. When a municipality legislates by promulgating an ordinance that exceeds its authority, courts, even courts of general jurisdiction, will not recognize the effect of the ordinance because to do so would enlarge the authority of the *municipality* beyond what has been granted to it. Even though a court may have subject matter jurisdiction, it errs if it gives efficacy to an *ultra vires* ordinance.

The above proposition is founded on a rule that is generally accepted throughout jurisdictions in the United States:

> "The well-established general rule is that a municipal corporation cannot create by ordinance a right of action between third persons or enlarge the *common law or statutory duty or liability* of citizens among themselves. Under the rule, an ordinance cannot directly create a civil liability

of one citizen to another or relieve one citizen from a liability by imposing it on another."

Eugene McQuillin, 6 *The Law of Municipal Corporations* § 22.01, 388 (3d ed 1998) (emphasis added; footnote omitted). The lead opinion's reasoning and its conclusion in this case are in contradiction to McQuillin's pronouncement. When a municipality undertakes to provide a remedy for the violations of its ordinances by directing a state court to entertain actions for the violations, it acts in an *ultra vires* manner outside its grant of authority because it has sought to enlarge its grant of authority. Here, by its ordinance, the city has created a new, civil cause of action between private citizens that enlarges liability in a state court. That liability is not founded on a state statute or the common law. Nonetheless, the lead opinion says "Oregon cities *can* 'enlarge the common law * * * duty or liability of citizens among themselves'." 165 Or App at 193 (emphasis in original). That assertion cannot be correct in the context of this case because the city did not merely impose a liability, duty or standard of care on its citizens but sought to provide a new common-law remedy that is enforceable by private parties in an extraterritorial forum, the state circuit court. The common law is not a product of the legislative will of a municipality. Common-law remedies are created by courts when confronted with conduct causing injuries that the court believes should be compensable. In creating a common-law remedy, the court exercises the sovereign prerogative of choosing between the view that the court for lack of precedent is impotent and the view that the court has authority to declare a remedy to grant redress for injury resulting from conduct which universal opinion would condemn. *Nees v. Hocks*, 272 Or 210, 215, 536 P2d 512 (1975). The circuit court's authority to enlarge common-law remedies to citizens is implicit if not express from the authority granted to it by section 9. There is no such corresponding grant to municipalities.

McQuillin also states another general rule that is applicable to the analysis in this case:

"However, the mere fact that an ordinance cannot directly create a civil cause of action does not mean that state law cannot attach tortious liability to a breach of an ordinance

proximately causing injury to another, and in many juris-
dictions, if not all, such a breach of an ordinance under cer-
tain circumstances constitutes or evidences a civil and
actionable wrong."

McQuillin, 6 *The Law of Municipal Corporations* § 22.01 at
388. That rule recognizes situations in which no enlargement
of the municipality's authority occurs. A municipality's police
power permits it to govern the conduct of its citizens and to
impose standards of care or conduct that are consistent with
its grant of authority. When it imposes a standard of care or
duty on its citizens, there is no *conflict* with state sovereignty
because the municipality is regulating within its own bound-
aries and within its grant of authority. When a cause of
action is predicated on the violation of the standard imposed
by the municipality and is founded on a theory of civil recov-
ery for a wrong recognized by the state court, the state court
is a proper forum for the claim. Such a situation is devoid of
any *ultra vires* exercise of authority by the municipality, in
contrast to the situation where the municipality directs the
state court to provide a forum for what is otherwise a noncog-
nizable claim within its jurisprudence.

Examples of the application of both of McQuillin's
rules can be found in Oregon case law. The first rule finds
expression in *La Grande v. Municipal Court et al.*, 120 Or
109, 251 P 308 (1926). In that case, A. W. Wall was
"[c]onvicted in the recorder's court of a violation of an ordi-
nance of the City of La Grande[.]" *Id.* at 110. He gave notice of
appeal to the Circuit Court of Union County. The municipal
judge, acting under the city's initiative charter, which pro-
vided for a right of appeal to the circuit court, "allowed the
appeal, approved the proffered undertaking and ordered a
stay of execution on the judgment appealed from." The city
then sought a writ of review challenging Wall's right to
appeal.

On appeal, the Oregon Supreme Court explained:

"From the earliest times to the present, it has been the
law of this state that grants of power to municipal corpora-
tions are to be strictly construed[.]"

*Id.* at 112. The court reasoned:

> "If a city can assume extramural powers which the legislative branch of the government by general law might grant but has not conferred, the municipality need not wait for the sanction of a general law to appropriate to its own use and behest the whole judicial system of the state. * * * [That] doctrine * * * would lead naturally to the usurpation of the state power by every locality that chose to do so."

*Id.* at 115. Concluding that Wall could not appeal to the circuit court, the court said:

> "The state has a right to establish its own tribunals and has done so. Until it gives authority to a municipality to add to or detract from the duties of state courts there must be some primary authority issuing from the state in the form of general legislation. There is no such legislation with respect to appeals from the municipal court of La Grande."

*Id.* at 116. Because the city charter provision giving the right to its citizens to appeal to circuit court from the municipal court was *ultra vires,* Wall's remedy, an appeal to state court, was not cognizable in that court. The analogy to this case is apparent because the city's ordinance is also *ultra vires*; *i.e.,* the remedy it affords, a private claim for compensatory damages in state circuit court, is outside its grant of authority.

The holding in *City of Eugene v. Roberts*, 305 Or 641, 756 P2d 630 (1988), is also instructive. In that case, the city sought "to compel Lane County election officials to place on the state primary election ballot an 'advisory question' " that the city wished to submit to its voters. *Id.* at 643. The Secretary of State had directed the officials not to place the question on the ballot. In an appeal to the Supreme Court, one of the issues was whether the city could rely on its own charter and ordinances as authority to require the officials to place the question on the ballot in the absence of a state law requiring or authorizing a vote on an advisory question. Relying, in part, on the analysis in *La Grande,* the court rejected the city's argument. The court said:

> "The City here seeks to compel action by state and county officials. Home rule does not extend so far. The source of any duty to comply with the City's request must be in state law."

*City of Eugene*, 305 Or at 650. Under *La Grande* and *City of Eugene*, the source of authority to provide a forum for plaintiff's remedy must also be in state law.

In response to these cases, the lead opinion says,

"The effect of the Portland ordinance is to change the law that bears on such a claim, making it one on which the employee *can* prevail, but it does not add to the function or duties of the circuit court for it to adjudicate the claim.

"That contrasts with the situation presented in *La Grande*, * * * [and] *City of Eugene* * * *. In each of those cases, cities had to change state law in order to permit the state officials to do what the cities wanted them to do. The cases held that the cities simply did not have the power to do that."

165 Or App at 191 (emphasis in original). The lead opinion acknowledges that the holdings in *La Grande* and *City of Eugene* are illustrative of attempts by municipalities to change state law but claims that that is not the effect of PCC 23.01.080E. The lead opinion is wrong because the ordinance gives injured litigants a remedy in circuit court that otherwise they would not have under state law. Accordingly, the circuit court would have erred if it had not dismissed plaintiff's second claim. To have done otherwise would have permitted plaintiff to enforce an *ultra vires* ordinance as if it were a state statute.

The lead opinion also relies on the holdings in *Marsh v. McLaughlin et ux*, 210 Or 84, 309 P2d 188 (1957), and *Olson v. Chuck et al.*, 199 Or 90, 259 P2d 128 (1953). What the lead opinion fails to recognize is that those cases are examples of the application of the second rule that McQuillin describes in his treatise:[5] "[T]he mere fact that an ordinance

---

[5] Both *Marsh* and *Olson* concerned whether the violation of a municipal ordinance could give rise to a remedy in a state court under the common law. In *Olson*, the ordinances at issue imposed a duty on landowners to maintain their sidewalks and imposed liability for damages arising from the offender's fault or negligence. Because the plaintiff's claim was founded in common-law negligence as affected by the duty and liability imposed by the ordinance, a proper remedy existed in circuit court. In contrast, the city's charter in *Marsh* imposed a duty on landowners to repair their sidewalks but imposed no liability for damages for a violation. Accordingly, the Supreme Court affirmed the trial court's decision to sustain general demurrers to the common-law negligence and nuisance actions brought by the

cannot directly create a civil cause of action does not mean that state law cannot attach tortious liability to a breach of an ordinance." McQuillin, 6 *The Law of Municipal Corporations* § 22.01 at 388. There are a number of Oregon cases in which state courts have recognized civil liability arising out of the violation of an ordinance. For example, *Lange v. Minton*, 303 Or 484, 738 P2d 576 (1987), involved a negligence *per se* claim where plaintiff relied on a standard of care established by a city ordinance. Similarly, *Brennan v. City of Eugene*, 285 Or 401, 407, 591 P2d 719 (1979), involved a common-law negligence claim where the court concluded that the city's "agent had an employment responsibility to process license applications pursuant to the requirements of the ordinance." Additionally, in *Harris v. Sanders*, 142 Or App 126, 919 P2d 512, *rev den* 324 Or 322 (1996), the plaintiff appealed from a directed verdict for defendants on her claim that they were negligent *per se* because they violated an ordinance by failing to remove leaves from sidewalks abutting their property that caused her injury. We reversed and indicated that the issue was "[w]hether the liability imposed by [the ordinance could] include a duty for abutting landowners to maintain sidewalks free from leaves." *Id.* at 130. Specifically, we held that it was error for the trial court to conclude as a matter of law that an accumulation of leaves was not within the contemplation of the ordinance. Those cases express the rule that, when a municipality acts within the scope of its authority by establishing a duty or standard of care pursuant to its police power, the violation of the ordinance can be a ground for a remedy that is recognized by the circuit court's jurisprudence. None of the above cases involve an ordinance that is *ultra vires* or an ordinance that attempts to impose its will by changing state law.

According to the concurrence, the city without a grant of authority can provide lawfully a private right of action in a state court when its regulatory goal is a legitimate one. It relies on *Covey Garage v. Portland*, 157 Or 117, 70 P2d

---

plaintiff. This case presents a third variation of those facts. Although the duties imposed by the city's ordinances are within its charter authority, the remedy it seeks to provide, a private-law action in circuit court, is not authorized. Thus, this case differs from *Marsh* and *Olson* because it is not founded in common-law negligence.

566 (1937), as a case in which the city's creation of private liability was challenged as beyond the city's authority and upheld. In *Covey*, the ordinance provided, in part:

" 'The cash deposit, the surety bond, or the insurance policy, shall each be conditioned that the licensee, his surety or insurer, will pay any adjudicated claim within the limit of the liability of $1,000 ten days after the date of the final adjudication of any claim. The cash deposit, the surety bond or the liability insurance shall be further conditioned that the licensee and the surety or insurer will be liable for injury to or the death of any person and for damages to the property of any person caused by the carelessness, negligent or unlawful act of the driver of the vehicle rented or hired out. The liability of said cash deposit, said surety bond or liability insurance shall not exceed the sum of $1,000 arising out of any one accident: * * * Any person sustaining personal injuries or property damage caused by the carelessness, negligent or unlawful act of the driver of any motor vehicle rented or hired out under the terms of this article; or in case of death resulting from personal injuries, the personal representative of the deceased, is hereby authorized to institute an action against the licensee, the surety, or against the liability insurance company on his own relation in the name of the city and to prosecute the same to final judgment.* * *' "

157 Or at 120-21 (omissions in original). In determining that the standard imposed by the ordinance was a valid exercise of the city's police power, the court reasoned:

"The enactment of an ordinance or of a statute—unless they be merely codifications of existing regulations—necessarily alters the existing law. * * * Ordinarily, the violation of such a regulation constitutes negligence [*per se*] when applicable in civil actions. * * * In other words, the enactment of the ordinance affects the common law by prescribing a different standard of conduct."

*Id.* at 139. As to the remedy for the enforcement of the standard imposed by the ordinance, the court stated that the ordinance was a form of voluntarily incurred contractual liability.

"It may be avoided by avoiding the driverless car business; but, as a condition of entering the business, the bond must be filed. The liability attends upon the bailment even

> though the negligent injury is inflicted in some distant state. It is enforced in the remote place, not because Portland's authority extends there, but because the other state will enforce the contractual liability in its courts."

*Id.* at 140. Thus, *Covey* stands for the unremarkable proposition that a municipality may create liability between its citizens that may be enforced in a state court in accordance with an already available remedy. *Covey* is unlike this case because, here, the city is attempting to provide a tort remedy in a forum outside its territorial limits: in a court that does not already recognize such a remedy.

In light of the general rules pronounced in McQuillin's treatise and the holdings in *La Grande* and *City of Eugene,* the trial court did not err in granting summary judgment on plaintiff's second claim. The city has no authority to require state courts to provide a forum for the violations of its ordinances, and the circuit court would exercise its authority erroneously if it were to recognize the remedy that the city prescribes. It does not follow from the fact that circuit courts exercise subject matter jurisdiction over employment discrimination cases in general that its doors are open to the use of *ultra vires* remedies created by municipalities. To the extent that plaintiff's third claim rests on PCC 23.01.080E, it is similarly flawed. I turn then to the common-law aspect of the third claim.

To allege a common-law claim for wrongful discharge of an at-will employee, there must be a discharge and that discharge must be "wrongful." *McGanty v. Staudenraus*, 321 Or 532, 551, 901 P2d 841 (1995). Discharges have been recognized as "wrongful" in two categories of cases. The first category involves the discharge of a plaintiff for *fulfilling a societal obligation* such as serving on a jury. *Holien v. Sears, Roebuck and Co.*, 298 Or 76, 86, 689 P2d 1292 (1984) (quoting *Delaney v. Taco Time Int'l.*, 297 Or 10, 681 P2d 114 (1984)); *see also Nees*, 272 Or 210. Plaintiff's third claim that he was discharged because of his sexual orientation does not involve a discharge for fulfilling a societal obligation.

The second category in which a discharge has been found to be wrongful involves an employer who discharges an employee for *pursuing a right* that is of important public

interest as indicated by constitutional provisions, statutory provisions and case law and that is related to his role as an employee. *Holien*, 298 Or at 86. *Holien* is an example of a case that falls into the second category. The court in *Holien* explained:

> "In this case, the plaintiff, Holien, sued defendant Sears in her second claim alleging that she was terminated for fulfilling her right to be gainfully employed without being subject to sexual advances and sexual harassment. We have stated that sexual harassment on the job is a forbidden discriminatory act under state and federal law and an employe[e] has a legal right which is of important public interest not to be discharged for resisting sexual harassment on the job. Following the rationale of the second category of *Delaney*, it is not the supervisor's demand, or discriminatory sexual harassment, for which plaintiff seeks common law tort damages; it is for a tortious discharge following her rightful resistance to those demands or harassment. Such a discharge of an employe[e] by an employer would be an actionable common law tort under the second category of *Delaney* unless the provisions of ORS Chapter 659 demonstrate the legislature's intent * * * to abrogate or supersede any common law remedy for damages."

298 Or at 90-91. In this case, unlike in *Holien*, plaintiff's claim that he was terminated because of his sexual orientation does not involve a discharge for pursuing his right to file a complaint for discrimination with BOLI. In that regard, he is like the plaintiff in *Patton v. J. C. Penney Co.*, 301 Or 117, 719 P2d 854 (1986), who alleged that he was fired because he refused to terminate a social relationship with a coemployee. The plaintiff in *Patton* argued that his " 'fundamental, inalienable human rights were compromised * * * and made the subject of an illicit barter in that he was forced to forego these rights or to purchase them with his job.' " *Id.* at 121. The court rejected his argument, reasoning:

> "It may seem harsh that an employer can fire an employe[e] because of dislike of the employe[e]'s personal lifestyle, but because the plaintiff cannot show that the actions fit under an exception to the general rule, plaintiff is subject to the traditional doctrine of 'fire at will.' "

301 Or at 122. The same reasoning applies here. Plaintiff's claim falls outside the recognized exceptions to the rule that termination of employment ordinarily does not create a common-law tortious cause of action.[6]

Finally, plaintiff, the City and the *amicus curiae* argue that, because the ordinance defines a right, Article I, section 10, of the Oregon Constitution, compels a remedy. Article I, section 10, provides:

> "No court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay, and every man shall have remedy by due course of law for injury done him in his person, property, or reputation."

The preface to the argument is lacking. Article I, section 10 protects *statutory* and *common-law* rights. This case involves an *ultra vires* municipal ordinance. As I have previously pointed out, PCC 23.01.080E does not have the force of a state statute enacted by the legislature. Therefore, section 10 is inapplicable.

At the beginning of this opinion, I identified the issue as being whether a municipality's authority is improperly enlarged if it is held that the municipality can lawfully direct by ordinance that a state court provide a forum for a civil action brought by a private citizen based on the violation of municipal ordinances. The lead opinion has found authority for the City's enactment in section 9, a constitutional provision that has nothing to do with the authority of a municipality. In its reasoning process, the lead opinion has ignored the dictates of generally accepted legal propositions about state sovereignty and the resulting limitations on municipal authority. Its reasoning that PCC 23.01.080E is permissible because it does not enlarge the authority of the courts is mistaken. In fact, the ordinance changes state law regarding cognizable theories of employment discrimination and improperly enlarges the authority of municipalities as legislative bodies. Because no state statute, the constitution or the city's

---

[6] The court in *Delaney* also described a third category of cases "where an adequate existing remedy protects the interests of society so that an additional remedy of wrongful discharge will not be accorded." 297 Or at 16. That category is inapplicable here.

charter authorizes the city to promulgate such legislation, the city's ordinance is *ultra vires*, and it would be error for the circuit court to exercise its authority by furnishing efficacy to the ordinance. Consequently, the trial court did not err in granting summary judgment to defendants.

I dissent.